STATE of Wisconsin, Plaintiff-Appellant,

v.

Mark A. FLOOD, d/b/a/ Ashwood Grove Mobile Home Park, Defendant-Respondent. †

Court of Appeals

*No. 94–1497. Oral argument May 4, 1995.—Decided June 21, 1995.*

(Also reported in 536 N.W.2d 458.)

†Petition to review denied.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Bruce A. Craig*, assistant attorney general. There was oral argument by *Bruce A. Craig*.

On behalf of the defendant-respondent, there was a brief submitted by *John A. St. Peter* and *Paul W. Rosenfeldt* of *Edgarton, St. Peter, Petak, Massey & Bullon* of Fond du Lac. There was oral argument by *John A. St. Peter*.

Before Anderson, P.J., Brown and Snyder, JJ.

BROWN, J. The State charged Mark A. Flood with violating WIS. ADM. CODE § ATCP 125.02(1), which prohibits the operator of a mobile home park from requiring the purchase of a mobile home as a condition to the rental of a site at the park. These are known in the industry as "tie-ins" or "tied sales." The threshold issue is whether a plot of land which is owned by the operator and is part of the mobile home park, but which is presently undeveloped, is nonetheless a "site" within the meaning of the regulation. We hold that such plot of land is a "site" and reverse the trial court order dis-

missing the State's motion for summary judgment and granting Flood's motion for summary judgment.

Flood also raises these challenges not addressed by the trial court because of its disposition on the threshold issue: (1) whether a double-wide mobile home is a "mobile home" within the meaning of the regulation; (2) whether the State must prove *coercion* towards a prospective buyer-tenant as part of a tie-in claim; (3) whether WIS. ADM. CODE § ATCP 125.02(1) was promulgated without a rational basis to support it, thereby denying him due process and equal protection; and (4) whether the tied sale to an undeveloped lot is a violation of the regulation where another site is available. We address each issue in turn and reject Flood's arguments in total.

We review the issues under summary judgment methodology. *See* § 802.08, STATS. The undisputed facts from deposition testimony and pleadings are as follows. Flood owns and operates Ashwood Grove Mobile Home Park and also owns Flood Mobile Homes, Inc., a mobile home dealership. When Rose M. Parman attempted to rent a mobile home site at Ashwood, she informed Flood that she intended to purchase a double-wide mobile home from another dealer and place it in Ashwood.

Flood informed Parman that there were no double-wide sites available at the time, but if, and only if, she purchased a mobile home from him, he would develop and rent a lot known as the "Beier" for the placement of that home. Drainage, sewer and water plans had been engineered for the lot, but the only actual improvement on the lot was a sewer riser brought in because the sewer main passed through the area. Flood told Parman that she could place the mobile home on the lot in thirty days on temporary utility hookups.

The State sought a civil forfeiture against Flood for one of two alternative violations, the second of which involved the Beier lot.[1] Based on Flood's deposition testimony that he conditioned the development and subsequent rental of the Beier lot on Parman's purchase of a mobile home from his dealership, the State filed a motion for summary judgment on the second of its alternative claims—that Flood's "refusal to rent Rose Parman the Beier site at the Ashwood Grove Mobile Home Park unless she purchased a mobile home from his dealership . . . [was] a violation of [WIS. ADM. CODE §] ATCP 125.02(1)." Flood filed a cross-motion for summary judgment, arguing that the Beier lot was not a "site" within the meaning of § ATCP 125.02(1) because it was undeveloped. The circuit court granted Flood's motion, ruling that a parcel lacking permanent improvements, including gas, water and concrete pad, is not a "site" as defined in the regulation. We granted the State's leave to appeal the trial court's nonfinal order granting summary judgment and dismissing the State's second alternative claim against Flood.

The interpretation of a regulation is a question of law that we review de novo. *Brown v. Brown*, 177 Wis. 2d 512, 516, 503 N.W.2d 280, 281 (Ct. App. 1993). Our purpose is to ascertain and give effect to the intent of the regulation. *Id.* In ascertaining the intent, we look first to the plain meaning of the regulation. *Id.* If it clearly and unambiguously sets forth the intent, it is our duty to merely apply that intent to the facts and circumstances of the question presented. *Id.* A regula-

---

[1] The first of the alternative claims, which is not a subject of this appeal, involved another lot called the "Phoenix." That claim is scheduled for trial because of a dispute of material fact.

tion is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more different senses. *Id.* Whether a regulation is ambiguous is a question of law. *State v. Bucheger*, 149 Wis. 2d 502, 507, 440 N.W.2d 366, 368 (Ct. App. 1989).

Thus, we first look to the language of the applicable regulations. WISCONSIN ADM. CODE § ATCP 125.02(1) provides that no mobile home operator shall "[r]equire, as a condition to the rental of any site, the purchase of a mobile home from the operator or any dealer, manufacturer, or agent named by the operator." A "site" is defined by WIS. ADM. CODE § ATCP 125.01(7), in relevant part, as "any plot of land which is rented or offered for rental for the accommodation of a mobile home used for residential purposes."

The State argues that so long as a "plot of land" is "offered for rental," that land is a "site" within the meaning of § ATCP 125.01(7), regardless of the site's stage of development. The only further limitation on the term, as contended by the State both at oral argument to this court and to the trial court, would be whether the site was in an area "held out as a mobile home park."[2]

Conversely, Flood argues that "site" cannot refer to undeveloped plots because if that were the case, the regulation would have said so. In other words, the regulation would have specifically prohibited the tie-in sale of a mobile home to the *development* of a plot of land. We conclude that the parties present two arguably reasonable interpretations of the language of the applicable regulations and, therefore, hold that

---

[2] "Mobile home park" is defined as "any tract of land containing 2 or more sites." WIS. ADM. CODE § ATCP 125.01(2).

§ ATCP 125.01(7) defining "site" is ambiguous when read with the tie-in prohibition in § ATCP 125.02(1).

When construing an ambiguous provision, we look to the history, context, subject matter and object of that provision. *Brown*, 177 Wis. 2d at 517, 503 N.W.2d at 282. Our task is to construe the regulation to effectuate its purpose. *See Franklin v. Hous. Auth.*, 155 Wis. 2d 419, 426, 455 N.W.2d 668, 672 (Ct. App. 1990). Where the interpretation of the administering agency is reasonable and consistent with the regulation's purpose, we will defer to the agency's interpretation. *Id.* This is because an administrative agency knows the specific purposes of the regulations it has promulgated and has a certain expertise in the area it is called upon to regulate. *See Wagner v. DHSS*, 163 Wis. 2d 318, 325, 471 N.W.2d 269, 272 (Ct. App. 1991).

We first look to the rulemaking history to ascertain the purpose of the tie-in regulation. In 1976, the Department of Agriculture, Trade and Consumer Protection (DATCP)[3] added the tie-in prohibition to the mobile home park regulations and set forth the policy for the provision in the preface to 1976 WIS. ADM. CODE ch. AG 125 as follows:

> Zoning restrictions imposed by local units of government on the development and use of land for the location of mobile homes have resulted in a shortage of rental sites in many areas of the state. This

---

[3] The Department of Agriculture, Trade and Consumer Protection administers and promulgates regulations relating to the methods of competition and trade practices of mobile home parks. *See* WIS. ADM. CODE ch. ATCP 125; § 100.20, STATS. The DATCP's predecessor was the Department of Agriculture; for simplicity, we refer only to the DATCP.

shortage has had the effect of limiting competition between mobile home park operators in the rental of sites, placing many of them in a dominant market position with respect to persons renting or seeking to rent mobile home sites. This has impaired the bargaining position of tenants, and resulted in the imposition of undue burdens and requirements as conditions to the rental of mobile home sites. These have included required tie-in purchases of goods and services, including mobile homes, from the park operator or persons named by the operators, with the result that competition in the sale of such goods and services has been inhibited. . . . These and other acts or practices by mobile home park operators constitute unfair methods of competition and unfair trade practices in business, and are prohibited under section 100.20, Wis. Stats.

Then, in a 1986 legislative memorandum, the DATCP noted that the tie-in provision was "partly justified on the basis of anti-trust law and policy" and partly on the basis of consumer protection policy. DEPARTMENT OF AGRICULTURE, TRADE & CONSUMER PROTECTION, NOTICE AND REPORT OF PROPOSED AMENDMENT OF CHAPTER AG 125, WIS. ADM. CODE, MOBILE HOME PARKS 15 (Oct. 30, 1986).

Both parties argue that their respective constructions of the term "site" effectuate the DATCP's historical purpose regarding regulation of the mobile home industry. The State contends that the tie-in provision, based on antitrust and consumer protection policy, recognizes the unequal relationship between park operators and prospective tenants and how that relationship affects access to mobile homes. The State further argues that under Flood's interpretation of "site," mobile home park operators could circumvent the goals of these policies by keeping their plots of land

525

in "states of partial readiness" and offering them only to persons who agree to purchase a mobile home from them.

Flood argues that the "driving force" behind the DATCP's promulgation of the tie-in provision was the shortage of mobile home rental sites. Therefore, Flood contends, the State's construction of the rule would "fl[y] in the face of [this] policy" because under such construction, mobile home park operators are not rewarded for the development of new home sites with corresponding home sales and consequently will not risk investing in site development.

We side with the State, however, and conclude that it is not the stage of development of the plot of land that is relevant to the purpose of the rule, but whether the proscribed practice prevents a prospective purchaser free access to the market for the tied product—here, mobile homes. Although we acknowledge that Flood's rationale is not without merit, we still reject it. His argument presumes that park operators have no other means to finance development of sites other than to use proceeds from the tied sale to pay the cost of development. But the rules impose no limits on rent levels in the mobile home parks; therefore, park operators are "free to obtain an appropriate investment return from rental income, just as other residential developers are." DATCP, NOTICE AND REP. at 15. Moreover, presumably, park operators who provide a quality mobile home at a competitive price will sell more mobile homes, thereby providing a potential source of development funds.

We conclude that the development of sites can be accomplished by less anticompetitive means; therefore, the strong antitrust and consumer protection policy behind tying prohibitions supports not allowing park

operators to tie the development and subsequent rental of sites to the sale of mobile homes. The United States Supreme Court in *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5-6 (1958) (footnotes, citations and quoted source omitted), addressed the antitrust implications of tying arrangements:

> [A] tying arrangement may be defined as an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he [or she] will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed tying agreements serve hardly any purpose beyond the suppression of competition. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his [or her] power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products.

Thus, a seller can use its economic "power over the tying product to win customers that would otherwise have constituted a market available to competing producers of the tied product." *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 508 (1969).

Here, as indicated in the rulemaking history, zoning regulations have decreased the availability of mobile home sites, which in turn give park owners an increased market power over those sites. Tying arrangements allow park owners to exploit this market power to gain an advantage over their competitors in the mobile home market. Barriers to entry in the mar-

ket by new mobile home dealerships are created because in order for a new company to sell mobile homes, it not only must be able to supply the home, it must also be able to provide the site. *See id.* at 509.

■

We hold that the purpose of WIS. ADM. CODE § ATCP 125.02(1) is to prevent anticompetitive tying arrangements, and to effectuate that purpose, a plot of land becomes a "site" at the point it is placed on the market—which is when it is offered to rent. The stage of development of the plot is not relevant.

Furthermore, we agree with the State's concern regarding a park owner's ability to circumvent the rule if the meaning of "site" should turn on the stage of development. And, the facts in the record demonstrate that potential. During Flood's deposition, he testified that, for the most part, since the inception of the mobile home park in 1960 the construction of sites was under way continuously. At the time of the deposition, in an area of the mobile home park which Flood referred to as "Expansion I," there were seven lots planned for future development for the placement of mobile homes. These seven lots along with the Beier lot were indicated on a map used by Flood salespersons to show customers which lots would be available.

■

We conclude that allowing Flood to tie in the sale of mobile homes to the development and subsequent rental of those seven sites has the potential for circumventing the purpose of the rule. This is because Flood can keep sites in an undeveloped state until he has a buyer for a mobile home sold by him. Flood placed the undeveloped plot on the market and, in fact, promoted the undeveloped plot as an available site. Then, when a consumer wanted a plot of land upon which to place a

mobile home, Flood took advantage of the shortage of available land by tying in the development and rental of the site to the purchase of a mobile home. Thus, the "undeveloped" nature of the land was but an artificial distinction. The plot was still on the market—whether developed or undeveloped. Yet, Flood sought to use the "undeveloped" nature of this piece of the market as the means to avoid the strictures of tie-ins. We cannot allow this to take place.[4]

---

[4] However, we can envision the hypothetical situation where a park operator could fund, at least in part, the development of a presently undeveloped parcel through the tie-in sale of mobile homes, without violating the rule. Under the hypothetical, a park operator considers purchasing a parcel of undeveloped land as a possible location for a future mobile home park. As part of the financing plan for the development costs, the operator seeks coinvestors. Among those coinvestors are persons who provide funds, but who are also prospective residents of the to-be-developed park. The park operator's contributions to the joint venture include capital as well as expertise from working in the mobile home industry. The potential investors along with their capital investment, to even the deal, agree to purchase mobile homes from the park operator.

In this situation, the tie-in sale is not a "condition to the *rental* of any site." *See* WIS. ADM. CODE § ATCP 125.02(1) (emphasis added). Thus, the coinvestors are not renters in an inferior bargaining position looking for scarce mobile home sites, but are parties to a joint venture where their agreement to purchase mobile homes from the operator is but one part of a contract "towards a common objective," *see Bulgrin v. Madison Gas & Elec. Co.*, 125 Wis. 2d 405, 412, 373 N.W.2d 47, 51-52 (Ct. App. 1985), to acquire joint ownership in the future mobile home park. Thus, the bargaining positions of the parties are, conceivably, equalized by the park operator being in as much need of funds for the development of the park as the coinvestors are in need of mobile home sites. We conclude that their relationship, as members of a joint venture, might not be the type

529

██

We briefly address Flood's next argument. He contends that double-wide homes, like the one Parman considered purchasing, are not mobile homes under the regulations. WISCONSIN ADM. CODE § ATCP 125.01(1) defines "mobile home" as "a unit designed to be towed or transported and used as a residential dwelling, but does not include a unit used primarily for camping, touring, or recreational purposes." Flood argues that because a double-wide is transported in two parts and consequently cannot be inhabited at the same time it is transported, it is not a mobile home. We hold that from the plain meaning of the regulation's language, a "mobile home" must be *designed* to be both transported and to be a residential dwelling, but the rule does not impose the requirement of doing both at the same time. In fact, the rule excludes such units customarily transported and lived in at the same time—camping, touring and recreational vehicles. We observe that even though, as Flood contends, single-wide homes can arguably be lived in and transported at the same time, this does not mean that the definition of "mobile home" contemplated living in and traveling at the same time.

contemplated by the rule. Where the seller has no market power over the tying product—here, mobile home sites—it also lacks the ability to coerce the tied product—here, mobile homes. *See Northern Pac. Ry. v. United States*, 356 U.S. 1, 6-7 (1958). Under these hypothetical facts, the park operator bargains with the other members of the joint venture for the tie-in sale as a term of the agreement, but does not acquire the term by virtue of superior power in the mobile home sites market; that is, the park operator does not have the ability to coerce the tied sale of the mobile homes. We realize that our hypothetical is dicta, but include it anyway as a means to illustrate the *ratio decidendi* of our decision.

*Single-wide* homes were not even designed for that purpose. Flood's argument fails.

Flood also argues that since the regulation is founded, at least in part, upon antitrust policy, the State must prove that he possessed market power—that is, he had the ability to coerce the tied sale. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). Flood contends that there was no evidence that he had the market power to force Parman to buy a mobile home from him; therefore, the DATCP had no authority to enforce § ATCP 125.02(1).

We reject Flood's argument because the State's action was brought under the Wisconsin administrative regulations, not state or federal antitrust law. It is true that the rule has elements of antitrust policy as its foundation. It is also true that in its rulemaking proceedings, the DATCP determined that park operators have substantial market power. Thus the proof required to show a rule violation is significantly different from that needed to show a violation under the state and federal antitrust statutes. Market power, under the rule, is a legislative fact determined through legislative-type hearings and, as such, provides the necessary factual basis for proof of a rule violation. *See generally* Kenneth C. Davis, *Judicial, Legislative, and Administrative Lawmaking: A Proposed Research Service for the Supreme Court*, 71 MINN. L. REV. 1, 5 (1986). Legislative facts are not facts about the specific parties, but rather are facts which help determine policy or law made by legislative or administrative bodies. *See* II KENNETH C. DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 10.5, at 145 (3d ed. 1994).

Here, the DATCP is vested with the authority to regulate the methods of competition and trade prac-

tices in the mobile home industry. *See* § 100.20, STATS.; WIS. ADM. CODE ch. ATCP 125. The legislative fact—that park operators have substantial market power—is an answer to an industry-wide question—whether site shortage gave park operators an unfair competitive advantage in the mobile home market. Thus, facts about any individual park operator's ability to coerce is not helpful, standing alone, in determining policy or making law that will govern an entire industry. *See* DAVIS & PIERCE, JR., *supra*, at 146-47. Therefore, the market power of an individual operator charged with a violation of the rule is not a matter of separate proof as it might be in a state antitrust or federal antitrust action where market power can be a separate element to be proved. *See Jefferson Parish*, 466 U.S. at 13-14; *Independent Milk Producers Co-op v. Stoffel*, 102 Wis. 2d 1, 8, 298 N.W.2d 102, 105 (Ct. App. 1980); *see also Graphic Prods. Distribs., Inc. v. Itek Corp.*, 717 F.2d 1560, 1570 (11th Cir. 1983). Here, the tying regulation only commands the State to prove that the mobile home operator required "as a condition to the rental of any site, the purchase of a mobile home from the operator . . . ." *See* § ATCP 125.02(1).

Flood next challenges the factual basis for the tying regulation on due process and equal protection grounds; he argues that the "administrative record does not support a finding of widespread market power on the part of park operators." Therefore, he contends that his constitutional rights to due process and equal protection are violated because the tying provision does not have a reasonable and rational relationship to the purpose of the regulation. *See Liberty Homes, Inc. v. DILHR*, 136 Wis. 2d 368, 374-75, 401 N.W.2d 805, 808 (1987).

An administrative rule made pursuant to statutory authority is presumed constitutional. *Josam Mfg. Co. v. State Bd. of Health*, 26 Wis. 2d 587, 596, 133 N.W.2d 301, 307 (1965). When reviewing the factual basis for an administrative rule, our task is to determine whether the agency could have reasonably concluded that the rule would effectuate the legitimate governmental objective it is directed to implement. *See Liberty Homes*, 136 Wis. 2d at 385-86, 401 N.W.2d at 812-13. The question is not whether the agency could have chosen a different action or whether the record provides greater support for a different action, but whether "there are any facts in the record from which a reasonable person could reach the [agency's conclusion]." *Id.* at 387, 401 N.W.2d at 813.

Here, we hold that the facts in the record support the DATCP's rule; therefore, the DATCP could have reasonably concluded that the rule effectuates a legitimate governmental objective. *See id.* at 385, 401 N.W.2d at 812. Public hearings on the proposed rule were held in Madison, Appleton, Eau Claire, Racine and Janesville; the hearing testimony revealed that zoning regulations and other state and local restrictions have limited the number of mobile home park sites and created a monopoly position for park operators. The agency conducted a survey of mobile home dealers and parks in Milwaukee, Racine, Kenosha, Walworth and Rock counties. The survey revealed a site shortage in four of the five counties. *See generally*, DATCP, NOTICE AND REP. at 151-54. We conclude that the DATCP could have reasonably determined that park operators have sufficient market power such that the tie-in selling of mobile homes restricts competition

in the mobile home market and encourages unfair sales tactics.

Finally, Flood argues that a factual dispute over whether he offered to rent Parman another site, the "Phoenix," without conditioning that rental on the sale of a mobile home is dispositive of the appeal issue. He contends that so long as *a* site is available for unconditional rental, a mobile home park operator can condition the rental of another site on the sale of a mobile home without violating the tying prohibition. He cites the language in § ATCP 125.02(1), which prohibits the tie-in sale of a mobile home to the "rental of *any* site" and contends that "any" means "every." (Emphasis added.) Therefore, he asserts that we should remand for the trial court's determination of this issue.

We disagree with Flood's interpretation of the rule. We consider the plain meaning of "any" and in so doing consult the dictionary. "Any" means "to any extent" or "any . . . quantity." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 97 (unabr. 1976). "Every" is defined as "being each and all within the range of contemplated possibilities." *Id.* at 788. We conclude that "any" and "every" do not mean the same thing in this context and hold that the tying rule prevents the tie-in sale of mobile homes in any quantity and to any extent.

*By the Court.*—Order reversed.