Metropolitan Builders Association of Greater Milwaukee, Plaintiff-Appellant,

v.

Village of Germantown, Defendant-Respondent.

Court of Appeals

*No 2004AP1433. Submitted on briefs February 17, 2005. —Decided April 13, 2005.*

2005 WI App 103

(Also reported in 698 N.W.2d 301.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Joshua L. Gimbel* and *Dereck R. Brower* of *Michael Best & Friedrich LLP* of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Raymond J. Pollen* and *Amy J. Doyle* of *Crivello, Carlson & Mentkowski SC* of Milwaukee.

Before Anderson, P.J., Brown and Nettesheim, JJ.

¶ 1. BROWN, J.   This case involves a dispute over the use of impact fees that the Village of Germantown assessed on developers. The Village collected these fees for an Aquatic Center/Youth Center. Originally, it had contemplated a regular swimming pool, but it decided to build a spray ground—a playground with water—after voters rejected the swimming pool proposal. The Metropolitan Builders Association of Greater Milwaukee (MBA), an organization whose members include developers that paid the impact fees, challenged the permissibility of applying the fees to this new purpose. They want the money returned to the current owners of the affected lots. We hold that MBA has standing to make this challenge on behalf of its developer members based on the association standing rule our supreme court announced in *Wisconsin's Environmental Decade, Inc. v. PSC*, 69 Wis. 2d 1, 230 N.W.2d 243 (1975) (hereafter *WED*). We further hold that a spray ground is within the intended purpose of the impact fees:    to build some sort of recreational or youth facility. Finally, we conclude that the Village may apply the collected funds only to the proportion of the cost attributable to development. It must return any excess to the current lot owners.

¶ 2.   In April 1992, the Village resolved to prepare a preliminary study of potential impact fees to defray expenditures required for capital improvements that would be necessary to maintain the level of current municipal services for a rapidly growing population. The following month, the Village administrator sent a memorandum to the Village president and trustees, observing that Village staff had met on numerous occasions to discuss potential impact fees. One category for which the Village contemplated such a fee was a recreational facility, possibly including a municipal swimming pool.

461

¶ 3. At roughly the same time, the Village's Swimming Pool Ad Hoc Advisory Committee began to explore several issues relating to the construction of an aquatic facility. In particular, it considered the design, potential funding sources, and the advantages and disadvantages of constructing a public outdoor swimming pool. Having determined that the community favored such a facility, the committee elected to continue researching the feasibility and costs of such a project. It pursued its efforts into at least 1993.

¶ 4. In 1995, the Village prepared a park and recreation needs assessment. The Needs Assessment read in part:

**3. VILLAGE AQUATIC CENTER/YOUTH CENTER. (a) Inventory of Existing Swimming Pool; Current Deficiency.** Since the Village has no swimming pool or youth center, the current deficiency is 100%.

**(b) Indentif[ication] of Swimming Pool/Youth Center Facilities Required Because of Growth.** The life expectancy of a swimming pool and/or youth center is 25 years and the facilities are being sized to accommodate the year 2020 population; i.e. 26,406. On this basis the estimated cost of the project and the amount subject to the Aquatic Center/Youth Center impact fee is determined as follows:

| | | |
|---|---|---|
| Year 2020 population | 26,406 | |
| Less 1994 population | - 15,486 | |
| Growth | 10,920 | or 41.35% subject to impact fee |
| Aquatic Center/Youth Center Cost | | $1,800,000 |
| Less deficiency: (58.65%) | | - 1,055,700 |
| Estimated cost subject to impact fee | | $ 744,300 |

462

The total park and recreation impact fees came to $613.32 per residential unit, and $188.81 represented the portion attributable to the Aquatic Center/Youth Center.

¶ 5.  The Village responded with an impact fees ordinance that adopted the Needs Assessment's $613.32 park and recreation impact fee. *See* Village of German-town, Wis., Ordinance § 3.14 (1995).[1] Section 3.14(4) of the ordinance requires the Village to place the fees in an interest-bearing account separate from other Village revenues and to spend them only on the capital costs for which the Village imposed them. *Cf.* Wis. Stat. § 66.0617(8) (2003–04)[2] (statute regulating impact fees, imposing same requirements). The ordinance provides that if the Village fails to expend the collected funds for these purposes within seven years, it must return them to the current owners of the lots on which it assessed them. *See* Village of Germantown, Wis., Ordinance § 3.14(5)(b) and (c); *cf.* Wis. Stat. § 66.0617(9) (munici-pality must return fees not used for intended purpose within reasonable time to current owners of affected lots).

¶ 6.  On November 3, 1998, the Village held a referendum asking the voters to decide whether it should appropriate funds for a swimming pool/aquatic center. The $1.8 million cost projected in the Needs Assessment had grown to $2.97 million. Pursuant to the ordinance, impact fees would only cover 41.35% of the cost. The voters rejected the proposal. A May 1999 referendum on the issue produced the same result.

---

[1] All references to the Village of Germantown, Wis., Ordi-nance are to the 1995 version unless otherwise noted.

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

¶ 7. By 2001, the Village had collected approximately $103,000 for the Aquatic Center/Youth Center that would have to be returned if not used by the seven-year deadline. As a result, in early 2002, the Village began to explore other ideas for the proposed aquatic or youth center. It proposed a spray ground in March. A spray ground is essentially a playground with giant water sprinklers. It has water features typically found in the beach entry portion of an aquatic center but without standing water. The water and chlorination system is similar to that used in a traditional pool. In April, the town's finance committee approved "the use of aquatic center fees for a spray ground aquatic facility." The Village extended the seven-year time limit by two years to allow for implementation of the spray ground construction.

¶ 8. MBA challenged this alternative use of the fees, invoking VILLAGE OF GERMANTOWN, WIS., ORDINANCE § 3.14(6), which allows developers who want to contest the collection, use or amount of impact fees to file an appeal to the Village Board. *See also* WIS. STAT. § 66.0617(10) (requiring municipalities to implement such a procedure). MBA is a not-for-profit trade association whose membership comprises home builders. Some of these developers do business in the Village and have paid impact fees for the Aquatic Center/Youth Center. The organization's purposes include advocating affordable housing and monitoring municipalities' compliance with impact fees ordinances, which it claims "directly impact a[n] MBA member's cost of construction, proposed development, and marketing." According to MBA, when developers pass these costs on to their consumers, the end result adversely affects the affordability of the end product.

464

¶ 9. In response to MBA's challenge, the Village adopted a resolution denying its appeal. The resolution stated the Village's conclusion that "the spray ground, which is an aquatic recreational opportunity," fell within the ambit of permissible uses for the fees. It also declared that MBA lacked standing to challenge the fees because it did not qualify as a developer within the meaning of VILLAGE OF GERMANTOWN, WIS., ORDINANCE § 3.14(6). MBA subsequently requested a hearing before the Village Board. The Village granted its request but limited the hearing to the standing issue. Ultimately, the Village affirmed its previous resolution that the MBA lacked standing.

¶ 10. Following this determination, MBA filed a complaint with the circuit court for certiorari and declaratory relief. The circuit court denied relief both on the merits and based on MBA's lack of standing. MBA appeals.

¶ 11. When this court reviews a certiorari action, we review the municipality's decision rather than that of the circuit court. *See Winkelman v. Town of Delafield*, 2000 WI App 254, ¶ 3, 239 Wis. 2d 542, 620 N.W.2d 438 (purpose of certiorari review to test the validity of an agency's decision). The scope of our review extends only to examining whether the Village (1) kept within its jurisdiction, (2) properly applied the law, (3) acted arbitrarily or unreasonably or according to its will and not its judgment, and (4) made a decision based on evidence one might reasonably use to make the relevant determination. *Id.* We will uphold the Village's factual findings so long as sufficient evidence supports them, even if other evidence would support the opposite conclusion. *See CBS, Inc. v. LIRC*, 219 Wis. 2d 564, 567 n.3, 579 N.W. 2d 668 (1998).

¶ 12.  MBA's right to challenge the use of the impact fees for a spray ground implicates the second of the four considerations above. Standing presents a question of law for our de novo review. *Chenequa Land Conservancy, Inc. v. Village of Hartland*, 2004 WI App 144, ¶ 12, 275 Wis. 2d 533, 685 N.W.2d 573 (hereafter *Chenequa*).

¶ 13.  We conclude based on *WED* that MBA has standing so long as any of its developer members has the right to challenge the use of the impact fees. In *WED*, our supreme court stated that the Wisconsin rule of standing had two parts:  first, whether the challenged action caused direct injury to the petitioner's interest and second, whether the interest affected was one recognized by law. *See WED*, 69 Wis. 2d at 10. Noting that federal cases constitute persuasive authority, the court observed the similarity of the federal test, which asked (1) whether the challenged action resulted in injury in fact and (2) whether the injured interest arguably fell within the zone of interests protected by the statute or constitutional guarantee in question. *See id*. at 10–11.

¶ 14.  The *WED* court recognized a special variation of this standing rule for associations when it allowed an organization devoted to environmental protection and preservation to sue, provided it could demonstrate sufficient facts on remand to show that a member of the organization could have sued. *See id*. at 17, 20. The court so ruled notwithstanding the fact that WED alleged no injuries to its organization but rather asserted only the environmental interests of members who lived in an area affected by natural gas use regulations. *See id*. at 18–20. Thus, as long as members of WED could meet the two-part standing test just

466

described, WED could stand in their shoes. Similarly, we conclude MBA may stand in the shoes of its members.[3]

<hr />

[3] Our holding is consistent with federal case law that addresses the standing of an organization. *Cf. Wisconsin's Environmental Decade, Inc. v. PSC*, 69 Wis. 2d 1, 11, 230 N.W.2d 243 (1975) (federal case law persuasive as to what standing rules should be). The federal courts allow an association to bring suit on behalf of its members when (1) the members would otherwise have standing to sue on their own, (2) the interests the association seeks to protect are germane to the association's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

In this case, the federal three-part test would favor standing. First, as we explain below, individual developers would have the right to sue on their own behalf. Second, protecting developers' interest in proper use of the impact fees is germane to MBA's mission to advocate for affordable housing, because impact fees can affect the affordability of housing. *See* Wis. Stat. § 66.0617(4)(a)3. (requiring needs assessments for impact fees to include "an estimate of the effect of . . . impact fees on the availability of affordable housing within the political subdivision"). Finally, determining whether the Village is using the collected impact fees for a proper purpose does not require the participation of individual developers. That determination does not change based on which developers paid the fees or even who paid how much, so individualized fact finding is unnecessary.

Moreover, we do not think Village of Germantown, Wis., Ordinance § 3.14(6) attempts to supercede association standing rules just because it expressly gives only developers the right to challenge the use of impact fees. In *Pennell v. City of San Jose*, 485 U.S. 1 (1988), the Court applied the three-part test when it allowed the Tri-County Apartment House Owners Association to challenge a rent-control ordinance on behalf of landowners who were members of the association. *See generally id.* at 4–8. The ordinance, which gave tenants who objected to certain

¶ 15. Compelling policy considerations bolster our conclusion that we should recognize MBA's standing. *WED* indicated that the courts should construe the law of standing in Wisconsin liberally and recognized that public policy should play a role in that construction. *See id.* at 13; *see also Milwaukee Dist. Council 48 v. Milwaukee County*, 2001 WI 65, ¶¶ 38, 45–47, 244 Wis. 2d 333, 627 N.W.2d 866. Although the court in *Milwaukee District Council 48* recognized that a labor union had interests of its own that sufficed to confer standing, it cited public policy and the mandate to construe standing rules liberally as independent reasons supporting standing. *Id.*, ¶ 38 n.7. It noted that although theoretically "thousands of the union's vested members could have filed suit as individuals" to seek a declaration of their due process rights in connection with the possible denial of their pensions, they instead chose to take collective action through the union. *Id.*, ¶ 45; *see also id.*, ¶ 45 n.8 (citing the three-part test for association standing set forth in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) as persuasive authority). It further noted that few individuals were in a position to assert that both termination for cause and termination of pension benefits were imminent. *Id.*, ¶ 46. Waiting until they could do so would defeat the purpose of declaratory judgment, according to the court, because by that point, the status quo might be irretrievably shattered. *See id.* The court concluded

---

rental increases the right to a hearing before a mediation hearing officer, entitled a *tenant or landlord* dissatisfied with the outcome of such hearing to pursue binding arbitration. *Id.* at 5–6. The fact that the ordinance in question named those specific classes of parties did not, however, preclude the United States Supreme Court from recognizing the standing of an organization to assert a claim on their behalf.

that "judicial economy and common sense dictate that the union is authorized to seek a declaration of rights." *Id.*, ¶ 47.

¶ 16.   We have similar policy concerns here. First, although individual developers could all bring separate challenges to the use of the impact fees, judicial economy would suffer. It makes more sense for the Village to make only one determination about the propriety of using the impact fees, which the developers appeal to the circuit court in one petition for certiorari and declaratory relief. There is simply nothing to be gained from repeated litigation of the same issue. Second, we recognize that an individual developer may have disincentives to object. The objector may fear retaliation in the form of uncooperativeness with respect to zoning, building permits, and future development projects if the Village perceives it as a troublemaker. The ordinance allows developers to challenge use of the fees, and they can do so most effectively through collective action.

¶ 17.   The Village argues that we should not apply the *WED* association standing rule. It observes that in an action for declaratory judgment, *Loy v. Bunderson*, 107 Wis. 2d 400, 410, 320 N.W.2d 175 (1982), requires four factors to be satisfied before courts consider the case justiciable. With respect to the third factor, which requires a party to have an interest in the controversy, *id.*, the Village notes that the courts have required a party to show a personal stake in the controversy. According to the Village, *Village of Slinger v. City of Hartford*, 2002 WI App 187, ¶ 12, 256 Wis. 2d 859, 650 N.W.2d 81, and *Lake Country Racquet & Athletic Club, Inc. v. Village of Hartland*, 2002 WI App 301, ¶ 19, 259 Wis. 2d 107, 655 N.W.2d 189 (hereafter *Lake Country*), require this stake to be pecuniary in nature. It further

cites *Chenequa* for the proposition that this personal stake standing requirement differs from the standing test in *WED*. It seizes on the following language: "A somewhat different formulation [of the standing test] has been used when determining whether a person has standing to appeal an administrative agency decision under Wis. Stat. ch. 227 . . . ." *See Chenequa*, 275 Wis. 2d 533, ¶ 15. The Village reads this statement to mean *WED* applies only to standing based on WIS. STAT. ch. 227.

¶ 18. We reject the Village's argument. First, nothing in *WED* purported to limit the court's standing rules to WIS. STAT. ch. 227 cases or even other administrative review appeals. Rather, it characterized its two-part standing test as "[t]he Wisconsin rule of standing." *See WED*, 69 Wis. 2d at 10. The court observed that the requirements in WIS. STAT. §§ 227.15 and 227.16(1)[4]— which required a person to be "aggrieved" and "directly affected"—essentially required the party to demonstrate "a direct effect on his legally protected interests," *see WED*, 69 Wis. 2d at 9, language nearly identical to that in the two-part test, *see id.* at 10. If anything, the court appeared to recognize the *similarity* between normal standing rules and standing requirements in ch. 227. Moreover, although most of the federal decisions *WED* relied upon as persuasive authority for its association standing rule involved appeals from administrative proceedings, at least one, *Sierra Club v. Leslie Salt Co.*, 354 F. Supp. 1099 (N.D. Cal. 1972), did not.

¶ 19. Second, the Village misreads *Chenequa*. In *Chenequa*, we expressed the personal stake factor in declaratory judgment actions as a "logical nexus" re-

---

[4] These sections have been renumbered as WIS. STAT. §§ 227.52 and 227.53(1), with minor variations in language.

quirement. *See Chenequa*, 275 Wis. 2d 533, ¶ 14 (noting that *Madison General Hospital Ass'n v. City of Madison*, 71 Wis. 2d 259, 265, 237 N.W.2d 750 (1976), a declaratory judgment action, had employed the "logical nexus" test, which requires that the plaintiff "must have suffered some actual or threatened injury from the allegedly illegal action and there must be a logical nexus between the status of the plaintiff and the claim sought to be adjudicated"). By contrast, the court characterized *WED*'s formulation as requiring that the "injury in fact and the interest injured must be one protected by law, that is, arguably within the zone of interests to be protected or regulated by the statute or constitutional provision in question." *See Chenequa*, 275 Wis. 2d 533, ¶ 15.

¶ 20. Although the court did call *WED*'s test "[a] somewhat different formulation," *Chenequa*, 275 Wis. 2d 533, ¶ 15, it made clear that the difference was purely semantic:

> We view the "logical nexus" requirement and the "arguably within the zone of interests sought to be protected" requirement as *essentially equivalent:* both require that the actual or threatened injury be to an interest that is arguably protected by the statutory or constitutional law upon which the plaintiff bases the claim for relief. Because this suit challenges the actions of DOT . . . we will use the "zone of interests" *terminology.*

*Id.*, ¶ 16 (emphases added). Given that *Chenequa* involved a request for declaratory judgment and was not a Wis. Stat. ch. 227 review case, *Chenequa*, 275 Wis. 2d 533, ¶¶ 1, 7, we do not see how *WED*'s standing test can be relegated to the context of ch. 227 review. Further, if the general standing test is the same in both ch. 227 review and other declaratory relief actions, we see no

471

reason to limit the association standing rule to the former. As long as individual developers would have a personal stake in the controversy, MBA may contest the use of impact fees on their behalf.

¶ 21. We determine that individual developers subject to the impact fees do have the right to bring their own separate challenges. Although the Village does not raise the issue, it is worth noting that our legislature has made that decision for us. VILLAGE OF GERMANTOWN, WIS., ORDINANCE § 3.14(6), the ordinance that permits developers to challenge the use of impact fees, appears to have been passed pursuant to WIS. STAT. § 66.0617(10). Section 66.0617(10) states in pertinent part:

> A political subdivision that enacts an impact fee ordinance under this section shall, by ordinance, specify a procedure under which a developer upon whom an impact fee is imposed has the right to contest the amount, collection or use of the impact fee to the governing body of the political subdivision.

This law reveals a legislative determination that developers have an important enough interest in the process of raising and expending the fees to deserve to be heard.

¶ 22. MBA observes that impact fees directly affect its members' construction, marketing, and proposed development costs, ultimately forcing them to pass on these costs to their consumers, which makes the end product less affordable. Considerations of this sort likely influenced our legislature's conclusion that developers had an important interest in the use of impact fees. *See* WIS. STAT. § 66.0617(4)(a)3. (requiring needs assessments for impact fees to include "an estimate of the effect of ... impact fees on the availability of affordable housing within the political subdivision"). In

472

any event, we will not disturb this legislative fact. *See State v. Flood*, 195 Wis. 2d 515, 531, 536 N.W.2d 458 (Ct. App. 1995) (describing legislative facts as facts that legislative or administrative bodies determine through the legislative process and rely upon in making law and policy).

¶ 23.  Because we deem the legislature's judgment conclusive on the issue of the developers' standing, we need not separately apply our standing case law. We do, however, wish to emphasize that our decision does not contradict anything in *Village of Slinger* or *Lake Country*. We reject the Village's apparent characterization of these cases as requiring a plaintiff to show an injury to a pecuniary interest as a prerequisite to standing in all declaratory judgment cases.

¶ 24.  *Lake Country* and *Chenequa* make clear that both pecuniary and nonpecuniary injuries may suffice to give a claimant a personal stake in the controversy. We quote the following language in *Lake Country*:

> In *Village of Slinger* . . . the court of appeals held that in order to have standing to bring a declaratory judgment action, a party must have a personal stake in the outcome and be directly affected by the issue in controversy. This is measured by whether the claimant has sustained, or will sustain, some pecuniary loss *or otherwise will sustain a substantial injury to his or her interests*. Here, Lake Country has failed to bring forth any facts demonstrating any pecuniary loss *or the risk of any substantial injury to its interests*.

*Lake Country*, 259 Wis. 2d 107, ¶ 17 (citations omitted; emphases added). Similarly, *Chenequa* recognized that a variety of injuries could fulfill the personal stake in the controversy requirement. "The injury asserted must be such that it gives the plaintiff a personal stake in the outcome of the controversy. The injury need not be

473

pecuniary; it may, for example, be an injury to interests that are aesthetic, conservational, or recreational." *Chenequa*, 275 Wis. 2d 533, ¶ 17 (citation omitted).

¶ 25.   Lake Country lacked standing not because it failed to assert a pecuniary injury but because it failed to allege any injury whatsoever. It simply disagreed with the Village of Hartland's decision to convey Village property to the YMCA and to rezone the parcel to allow the YMCA to operate a recreational facility. *Lake Country*, 259 Wis. 2d 107, ¶¶ 1–5, 23. Here the legislature obviously recognized that developers have an interest of some sort. Based on *Lake Country* and *Chenequa*, it makes little difference whether that interest is pecuniary or nonpecuniary in nature.[5]

¶ 26.   Although *Village of Slinger*, 256 Wis. 2d 859, ¶ 9, did say that a "taxpayer must have sustained, or will sustain, some pecuniary loss before he or she has standing," we observe that impact fees are not general tax revenues to be used for any purpose. *See* WIS. STAT. § 66.0617(8) (impact fees revenues to be placed in

---

[5] Although we conclude that an individual developer would have no obligation to demonstrate a pecuniary stake in an action in which it challenged the use of the impact fees money, we note that such a showing may well be possible. As we noted above, the legislature may have considered evidence that impact fees affected developers' construction, marketing and proposed development costs; it is possible that a developer would offer similar evidence in court. Additionally, both the impact fees ordinance and our statutes require the Village to return impact fees that they do not use within a certain period of time to the current owners of the property. *See* VILLAGE OF GERMANTOWN, WIS., ORDINANCE § 3.14(5)(b) and (c) (nine years, as amended); WIS. STAT. § 66.0617(9) ("within a reasonable period of time after they are collected"). Certainly, it is possible that a developer could be the current property owner entitled to the refund of fees.

474

separate account and accounted for separately from other funds and spent only on capital costs for which the municipality imposed them). We read *Village of Slinger* and *Lake Country* to stand only for the proposition that mere status as a taxpayer or property owner does not suffice to confer standing. *See Village of Slinger*, 256 Wis. 2d 859 ¶ 9 (taxpayer with pecuniary loss has standing), ¶ 17 (noting that landownership did not create a right to dictate development of neighboring property); *Lake Country*, 259 Wis. 2d 107, ¶¶ 14, 16, 20 (rejecting Lake Country's contention that "its status as a village taxpayer and property owner confers standing to prosecute this action"). Thus, these cases are largely inapposite. Developers who wished to sue would not need to invoke their taxpayer or landowner status when they could simply assert their legislative standing rights based on the impact fees ordinance and statute.

¶ 27.   Having determined that MBA has standing, we now reach the merits. Both parties agree that the Village must spend the impact fees "only for capital costs for which the impact fees were imposed." *See* Village of Germantown, Wis., Ordinance § 3.14(4); Wis. Stat. § 66.0617(8). They simply disagree about what constitutes "the capital costs for which the impact fees were imposed." MBA maintains that the language refers to the costs of a particular $1.8 million swimming pool, while the Village contends that it merely intended to raise funds for a specific category of facility, an aquatic or youth recreational facility, and intended to work out the particular details later.

¶ 28.   We must construe the ordinance in order to resolve this dispute. The meaning of an ordinance is a question of law that we review independently of the

475

circuit court. *See Bruno v. Milwaukee County*, 2003 WI 28, ¶ 6, 260 Wis. 2d 633, 660 N.W.2d 656. We interpret municipal ordinances the same way we read statutes. *Id.* First we look at the language of the ordinance. *Id.*, ¶ 7. We give words their common and ordinary meaning, and if that meaning is clear, we simply apply the ordinance to the facts using that plain meaning without resorting to rules of statutory construction. *Id.*, ¶¶ 7, 8. If, however, the ordinance is ambiguous, we attempt to discern the legislative intent from the ordinance's scope, history, context, subject matter and purpose. *See State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 48, 271 Wis. 2d 633, 681 N.W.2d 110.

¶ 29.   In this case, the plain language of the ordinance does not unequivocally favor either construction. VILLAGE OF GERMANTOWN, WIS., ORDINANCE § 3.14(1) and (5) are the only provisions that specifically deal with the purposes for which the Village intends to expend the fees. Neither mentions either aquatic and youth facilities generally or swimming pools in particular. Rather, they impose $613.32 fees for parks, playgrounds and other recreational facilities. *See* § 3.14(1) and (5).

¶ 30.   Because the ordinance is ambiguous, we look to extrinsic sources to determine the drafters' intent. We next examine the history of the impact fees ordinance. Significantly, the $613.32 that the ordinance imposed for parks and recreation was the same amount the 1995 Needs Assessment allocated to that purpose. Thus, we assume that the Village intended its ordinance to incorporate the Needs Assessment.

¶ 31.   The language in the Needs Assessment reveals that the Village intended to exact impact fees not for a specific facility but rather for a specific *kind* of facility, namely one devoted to youth or aquatic entertainment. We focus on several provisions, turning first

476

to § 3, much of which we have quoted above. Section 3, entitled "VILLAGE AQUATIC CENTER/YOUTH CENTER," assesses in para. (a) the current deficiency of an "Existing Swimming Pool," concluding, that "[s]ince the Village has no swimming pool *or youth center,* the current deficiency is 100%." (Emphasis added.) Similarly, para. (b)—which identifies "Swimming Pool/Youth Center Facilities Required Because of Growth"—observes that "The life expectancy of a swimming pool *and/or youth center* is 25 years . . . ." (Emphasis added.) Accordingly, it estimated an "Aquatic Center/Youth Center Cost." Section 3(c) computes an "Aquatic Center/Youth Center Fee." Finally, Section 4, which summarizes the fees, allocates $188.80 of the $613.32 park and recreation impact fees to an "Aquatic Center/Youth Center." Moreover, the Needs Assessment says nothing about a $1.8 million *swimming pool.* Although it does twice mention a $1.8 million cost estimate, it again refers to the proposal in very general terms as an aquatic center or aquatic center/youth center.

¶ 32. MBA seizes on the work of the "Swimming Pool Ad Hoc Advisory Committee" prior to the filing of the Needs Assessment as evidence that the Village contemplated using the impact fees only for a swimming pool; we determine that such an inference is misplaced. The fact that the committee provided sketches of a particular design in its final report does *not* signify that this was the only design it considered, as opposed to merely being "Plan A." Indeed, language in the report makes clear that even this plan was not carved in stone; rather, important details remained open to revision. "When looking at a *possible* comprehensive design for an Aquatic Center, another consideration may be the inclusion of a 'community center-

type building within the overall scheme of things. Such a building is generally viewed as being a year around, multi-purpose facility." (Emphasis added.)

¶ 33.   Further, the report commented that the " 'community center' type" building could be a "center of community activities" if "integrated into the design of an Aquatic Center, or if merely constructed in the same vicinity." Given that the sketches showed an *outdoor* pool and that the quoted language referred to multiple purposes for the community center building, we assume the committee contemplated the building to create recreational opportunities other than swimming. In view of the fact that Wisconsin weather precludes outdoor swimming for most of the year, we presume the committee contemplated that these other recreational opportunities would be primary in all but the warmest months. We do not see why the Village could not follow the committee's lead in remaining open to varied recreational options for its proposed facility.

¶ 34.   Moreover, even if we assume the *committee* had a specific design in mind, that does not mean the *Village* confined itself to this idea. We note that although the committee's final report used the term "aquatic center" and referred to swimming pools in various places, it did not anywhere refer to a "youth center." We deem it significant that the Needs Assessment employed broader language. We conclude from the foregoing that although the Village certainly entertained the swimming pool idea, it merely considered it an obvious and likely choice among other choices, some perhaps yet to be contemplated.

¶ 35.   We also consider the ordinance against the legislative backdrop of Wis. Stat. § 66.0617, the statute that allows municipalities to enact ordinances that levy impact fees on developers to pay for the capital ex-

penses necessary to accommodate new development. *See* § 66.0617(2). Section 66.0617(9), which mandates that municipalities that do not use the fees for their contemplated purposes within a reasonable time return those fees to the owners of the affected properties, reads in pertinent part:

> The ordinance shall specify, by *type* of public facility, reasonable time periods within which impact fees must be spent or refunded . . . . In determining the length of the time periods under the ordinance, a political subdivision shall consider what are appropriate *planning* and financing periods for the particular *types* of public facilities for which the impact fees are imposed. (Emphases added.)

Section 66.0617(6) imposes standards for impact fees and demands that the fees be "based upon actual capital costs *or reasonable estimates* of capital costs." *See* § 66.0617(6)(c) (emphasis added). Similarly, § 66.0617(4)(a)3. requires a Needs Assessment to provide a "detailed *estimate*" of the capital costs the municipality will incur. (Emphasis added.)

¶ 36. Because these various statutory provisions all deal with the process of imposing and using impact fees as their subject matter, we read them in pari materia and attempt to harmonize them. *Cf. R.W.S. v. State*, 162 Wis. 2d 862, 871, 471 N.W.2d 16 (1991) (courts to read multiple statutes in same chapter in pari materia and attempt to harmonize them). We interpret these provisions to allow a municipality to impose impact fees for a general *type* of facility, such as an aquatic or youth center, without committing itself to any particular proposal before charging the fees. The needs assessment must simply contain a good-faith and informed estimate of the sort of costs it expects to incur for the kind of facility it plans to provide. It would be

479

absurd to assume that the "detailed *estimate*," WIS. STAT. § 66.0617(4)(a)3. (emphasis added), required as part of the needs assessment must be based on a single, detailed *proposal* if the municipality could subsequently pass an ordinance specifying only the general *type* of facility it intends to build. *See State v. Delaney*, 2003 WI 9, ¶ 15, 259 Wis. 2d 77, 658 N.W.2d 416 (reasonable constructions favored over those that lead to absurd results). It is the ordinance that actually imposes the fees, not the needs assessment. If the legislature intended to make a concrete proposal a prerequisite to imposing impact fees, it would have required such particularity in the former, not the latter. We therefore reject MBA's contention that if the Village based its Needs Assessment estimate on the cost of a swimming pool, it was obligated to construct only a swimming pool costing approximately $1.8 million or return the money.

¶ 37.    Finally, we consider the purpose of impact fees as evidence of the Village's intent in passing the impact fees ordinance. The preamble to the ordinance made clear that the Village intended the fees to "partially defray the cost of new development." Similarly, WIS. STAT. § 66.0617(2) cites accommodating land development as its purpose for authorizing municipalities to impose impact fees. The Needs Assessment directly addressed that purpose when it observed that the lack of a community swimming pool or youth center created a 100% deficiency in existing facilities. Obviously, the Village was concerned that in light of new development, new recreational opportunities would be necessary. We do not see why the particular details of that recreation are important to that purpose. Whether the Village chose to provide a youth center, a form of water recreation, or some combination of the two, population growth drove that decision.

¶ 38. Even more importantly, in order to effectively pursue this goal of providing new facilities to accommodate growth, a municipality must be allowed flexibility to deal with the contingencies inherent in such planning. Obviously, even reasonable cost estimates sometimes turn out to be wildly different from actual costs. In this case, a $1.8 million estimate turned out to be roughly $1.17 million too low. In light of this change, the Village only had two options available. It could stick with its original plan to construct a swimming pool—against the wishes of the taxpayers, who were still responsible for the majority of the now $2.97 million cost—or change the details of the proposal so that it could stay within budget. MBA's position that the only permissible use of the fees money is an approximately $1.8 million swimming pool appears to prohibit the Village from pursuing either course. We conclude, however, that the legislature, by its language, respected the importance of flexibility in the planning process. Again, WIS. STAT. § 66.0617(9) requires impact fees ordinances to specify only the *type* of facility for which they imposed the fees.

¶ 39. We hold that a spray ground falls within the broad "Aquatic Center/Youth Center" language in the Needs Assessment on which the Village based its impact fees ordinance. We assume it is readily apparent that a playground with giant water sprinklers is a youth-centered recreational opportunity. That fact suffices to legitimate the spray ground expenditure, given that the Needs Assessment referred to "aquatic center" and "youth center" disjunctively. Nonetheless, we note that the spray ground also offers "aquatic" recreation because the activities at such a facility "tak[e] place in or on water." *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 58 (10th ed. 1997) (definition of "aquatic").

¶ 40. MBA claims that even if a spray ground qualifies as an aquatic/youth opportunity, expending the fees on a spray ground is still illegal on the basis that it offends WIS. STAT. § 66.0617(4) and (6). Its argument appears to be three-fold. It first contends that because the Village did not conduct a new needs assessment, pursuant to § 66.0617(4)(a), it could not show that a spray ground "bear[s] a rational relationship to the need for new, expanded or improved public facilities that are required to serve land development." *See* § 66.0617(6)(a).

¶ 41. We reject this argument. WISCONSIN STAT. § 66.0617(4)(a) did not require a new needs assessment when the Village adopted the spray ground as "Plan B" after the voters rejected the swimming pool. Although that section does require a revised assessment when a municipality amends its ordinance by changing the public facilities for which it collects the fees, no such change happened here. As we explained above, the facility the Needs Assessment identified was an aquatic/youth center as a general concept, not a swimming pool in particular. Because it was this *general category* of facility for which the Needs Assessment found a deficiency, the Village's decision to construct a facility of that sort *is* rationally related to remedying that deficiency. Again, the particular details of the proposal are not important to the objective of ensuring that a growing population has something to do for recreation.

¶ 42. MBA also appears to focus on the difference in projected cost between a swimming pool and a spray ground as evidence that no rational relationship exists: "[A] $1.8 million Aquatic Center/Youth Center, not a[n] approximate $150,000 Spray Ground was required to serve land development." We conclude otherwise. The

cost of a swimming pool versus a spray ground does not determine whether or to what extent either addresses a deficiency in recreational opportunities. A more economical option does not necessarily serve fewer people.

¶ 43. MBA lastly points to the failed referenda as proof that an aquatic facility was not required to accommodate new development. Again, we disagree. The voters may well have rejected the construction of a swimming pool based on the inflated price tag—or some other reason—rather than an aversion to new recreational facilities. In any event, we will not speculate about what the "no" votes meant.

¶ 44. Although we conclude that the Village has the right to spend impact fees on the spray ground, we must also address *how much* of the cost it may legally offset with those fees and what happens to any excess. These issues, like the others, present matters of law for our de novo review. *See State v. Brandt*, 226 Wis. 2d 610, 618, 594 N.W.2d 759 (1999) (application of a set of facts to the appropriate legal standard is a question of law for our independent review).

██

¶ 45. We agree with MBA that the Village may offset only 41.35% of the cost with impact fees. WISCONSIN STAT. § 66.0617(6)(b) declares that impact fees imposed "[m]ay not exceed the proportionate share of the capital costs that are required to serve land development, as compared to existing uses of land within the political subdivision." *See also* § 66.0617(2) (authorizing municipalities to enact impact fees ordinances "to pay for the capital costs that are necessary to *accommodate land development*" (emphasis added)). The clear import of these provisions is to authorize municipalities to hold developers responsible only for the portion of capital costs whose necessity is attributable to their develop-

ments. Even if a spray ground costs significantly less than the original proposal, the Village cannot expect developers' money to subsidize the existing residents' proportionate share of the costs. The Village's Needs Assessment clearly identifies only 41.35% of the estimated 2020 population as attributable to growth.

¶ 46. If the impact fees revenues exceed the developers' proportionate share of the capital costs of the spray ground, the Village must return those fees to the current owners of the properties for which developers paid the fees. *See* VILLAGE OF GERMANTOWN, WIS., ORDINANCE § 3.14(5)(c) ("Impact fees . . . not used to pay the capital costs for which they were imposed within the time periods prescribed in par. (b) above shall be refunded to the current owner of the property with respect to which the impact fees were imposed."); WIS. STAT. § 66.0617(9) (ordinances to specify a "reasonable period of time" in which to spend the fees or refund the money to the "current owner of the property with respect to which impact fees were imposed").

¶ 47. We reject the Village's position that it may hold on to the impact fees it collected for the Aquatic Center/Youth Center until nine years have expired because it may think of other aquatic or youth recreational opportunities in the interim.[6] Section 3(b) of the Needs Assessment reads in pertinent part, "The life expectancy of *a* swimming pool and/or youth center is 25 years . . . ." (Emphasis added.) It then estimates the cost of an "Aquatic Center/Youth Center," not "Aquatic/Youth *Centers*." Section 4, which describes the

---

[6] MBA asserts that the nine-year time limit expired on July 31, 2004. We will not consider that issue, however, because MBA did not raise it until its reply brief. *See State v. Mechtel,* 176 Wis. 2d 87, 100, 499 N.W.2d 662 (1993) ("We do not generally address arguments raised for the first time in reply briefs.").

breakdown of the park and recreation impact fees also refers to an "Aquatic Center/Youth Center" in the singular. The Needs Assessment clearly contemplated only one Aquatic Center/Youth Center.

¶ 48.   We reverse the portion of the circuit court's judgment that denies MBA standing. MBA is an association whose members include developers, so it may contest the Village's use of impact fees as long as an individual developer could have brought its own challenge. Although we uphold the judgment to the extent that it recognized the spray ground as a proper use of the Aquatic Center/Youth Center impact fees money, we hold that the Village may only use the fees to cover developers' proportionate share of that cost. It must return any leftover funds to the current owners of the properties on which it assessed the fees.

*By the Court.*—Judgment affirmed in part and reversed in part.