CHENEQUA LAND CONSERVANCY, INC., Plaintiff-Respondent,

v.

VILLAGE OF HARTLAND, Defendant-Appellant,

LUTHERAN HIGH SCHOOL ASSOCIATION OF GREATER MILWAUKEE, Defendant-Co-Appellant,

Frank BUSALACCHI, Defendant.

Court of Appeals

*No. 03–2486. Submitted on briefs March 18, 2004.—Decided June 24, 2004.*

2004 WI App 144

(Also reported in 685 N.W.2d 573.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Raymond J. Pollen* and *Amy J. Doyle, Crivello, Carlson & Mentkowski, S.C.*, Milwaukee.

On behalf of the defendant-co-appellant, the cause was submitted on the briefs of *Jeffrey A. Schmeckpeper, Kasdorf, Lewis & Swietlik, S.C.*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *William P. O'Connor* and *Mary Beth Peranteau, Wheeler, Van Sickle & Anderson, S.C.*, Madison.

Before Deininger, P.J., Vergeront and Lundsten, JJ.

¶ 1. VERGERONT, J. Chenequa Land Conservancy, Inc. filed this action seeking a declaration that the conveyance of state property to the Village of Hartland was void because the conveyance violated WIS. STAT. § 84.09(5) (2001–02)[1] and a manual of the Wiscon-

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

sin Department of Transportation (DOT). The Conservancy also sought an order that the property be reconveyed to the state. The circuit court granted summary judgment in favor of the Conservancy, determining that title to the property remained in the state. Hartland, along with the Lutheran High School Association of Greater Milwaukee (the Association), appeals that judgment. The dispositive issue is whether the Conservancy has standing to bring this action. We conclude it does not. We therefore reverse and remand with directions to dismiss the amended complaint.

## BACKGROUND

¶ 2. The property that is the subject of this dispute consists of approximately seventy-eight acres in the Town of Merton, Waukesha County. In 2002, DOT declared this land surplus. In October 2002, both Hartland and the Village of Chenequa submitted offers to purchase. Hartland's offer was for $15,000 per acre contingent upon Hartland entering into an agreement with the Association to convey to the Association approximately sixty acres for the construction of a private high school; the remaining land was to be used for educational or recreational purposes and for public right-of-ways. Hartland's offer also provided for a connecting road to be built without public funds.

¶ 3. Chenequa offered to purchase approximately sixty-four acres for $15,500 per acre. Prior to making this offer, Chenequa entered into an agreement with the Conservancy whereby Chenequa agreed to purchase the property with the understanding that it would convey the property to the Conservancy, which proposed to maintain the property consistent with Chenequa's "open space" plan. Under the agreement, the Conservancy was

to deposit funds in an escrow account equal to Chenequa's estimated acquisition costs, which Chenequa was to use to purchase the property.

¶ 4. On November 11, 2002, DOT submitted a letter report to then Governor McCallum pursuant to WIS. STAT. § 84.09(5) and (5m)[2] asking his approval to sell the property to Hartland in accordance with the terms of that offer. The report had a signature line for

---

[2] WISCONSIN STAT. § 84.09(5) and (5m) provide:

(5) Subject to the approval of the governor, the department may sell at public or private sale property of whatever nature owned by the state and under the jurisdiction of the department when the department determines that the property is no longer necessary for the state's use for highway purposes and, if real property, the real property is not the subject of a petition under s. 16.375(2). The department shall present to the governor a full and complete report of the property to be sold, the reason for the sale, and the minimum price for which the same should be sold, together with an application for the governor's approval of the sale. The governor shall thereupon make such investigation as he or she may deem necessary and approve or disapprove the application. Upon such approval and receipt of the full purchase price, the department shall by appropriate deed or other instrument transfer the property to the purchaser. The approval of the governor is not required for public or private sale of property having a fair market value at the time of sale of not more than $3,000, for the transfer of surplus state real property to the department of administration under s. 16.375 or for the transfer of surplus state personal property to the department of tourism under sub. (5s). The funds derived from sales under this subsection shall be deposited in the transportation fund, and the expense incurred by the department in connection with the sale shall be paid from such fund.

(5m) Subject to the approval of the governor in the manner and form provided by sub. (5), the department may convey lands or interests therein acquired pursuant to this section and improvements installed thereon to municipalities within whose limits such lands or interests therein are located. The conveyance of said lands or interests therein and improvements shall restrict the use of the premises by the municipality to the uses for which they were

539

the governor to sign in approval. On November 14, Governor McCallum's facsimile signature was put on the report and the signed report was transmitted to DOT. That same day DOT notified Hartland that the governor had approved the sale and subsequently faxed a copy of the signed report to Hartland. The parties dispute whether the governor had actually approved the sale on November 14. It is not disputed, however, that on November 18 the governor's counsel wrote to DOT stating that the governor was "rescinding his approval of the Village of Hartland . . . sale to review the documents."

¶ 5. When no closing had taken place by December 9, 2002, Hartland filed a petition for a writ of mandamus ordering transfer of the property. The governor's counsel was informed of this petition and also was informed of DOT's position that a valid and binding contract for sale to Hartland had been formed. The governor's chief of staff testified that the decision was made that the governor's office would not object in writing to the sale to Hartland. The petition was voluntarily dismissed based on DOT's position that it was obligated to proceed with the sale to Hartland. The sale to Hartland took place shortly thereafter, and Hartland then conveyed approximately sixty acres to the Association.

---

acquired, except that said lands or interests therein declared by the department to be excess may be so conveyed without restrictions as to use.

At the time of the events of the case, WIS. STAT. § 16.375 contained provisions for transfer of surplus property to the department of administration. This section has since been renumbered WIS. STAT. § 560.9810, and this change is reflected in the current version of WIS. STAT. § 84.09(5). 2003 Wis. Act 33, §§ 161, 1684. However, for the sake of clarity, we cite to the 2001–02 version of the statutes.

¶ 6. Chenequa's offer had been formally rejected by DOT on December 3, 2002, with DOT explaining that the additional $500 per acre of Chenequa's offer did not compensate for the cost of building the necessary connecting road, which the Hartland offer proposed to do without public funds. On January 7, 2003, a representative of the Conservancy appeared at the meeting of the board of trustees of Chenequa and asked the board to consider pursuing legal action on the sale to Hartland. The minutes show the board went into closed session to confer with legal counsel and, upon reconvening, voted to decline to authorize legal action against DOT.

¶ 7. The Conservancy initiated this suit on its own soon thereafter. The amended complaint alleged that the letter report submitted to the governor on November 11, 2002, was not a full and complete report as required by WIS. STAT. § 84.09(5) because it contained various omissions and inaccuracies, that the governor had either not actually approved or had rescinded his approval of the sale to Hartland, and that the sale violated various polices of DOT contained in its Real Estate Program Manual. The Conservancy sought a temporary injunction, a declaration that the conveyance was unlawful under § 84.09(5) and therefore void, and an order that the property be reconveyed to the state.[3]

---

[3] The complaint also referenced WIS. STAT. § 84.09(5m). In the circuit court, the Conservancy argued that the sale violated that subsection because the property was not located within the village limits of Hartland, but was located in the Town of Merton, within the extra-territorial jurisdiction of Hartland. Section 84.09(5m) was not a basis for the circuit court's grant of summary judgment, and the parties do not mention it in their dispute over standing. Accordingly, we do not address this subsection.

¶ 8. The circuit court issued a temporary injunction preventing the Association from beginning construction pending the resolution of this action. The court also denied the defendants' motion to dismiss based on their position that the Conservancy did not have standing to bring this action. The court concluded that it was reasonable to infer from the allegations of the complaint that the Conservancy had a particularized and substantial interest, distinct from that held by the general public, in requiring DOT to adhere to its policies in the sale of this property.

¶ 9. The Conservancy and Hartland filed cross-motions for summary judgment, with the Association joining in Hartland's motion.[4] The circuit court granted the Conservancy's motion and denied Hartland's motion. The court concluded that the conveyance to Hartland was invalid on three independent grounds: (1) DOT's report submitted to the governor was not a "full and complete report" as required by WIS. STAT. § 84.09(3) because it did not disclose that the proposed sale was in conflict with DOT's land sale policies; (2) the governor's counsel put a facsimile of the governor's signature on the report in error and the governor did not actually approve the sale, and (3) even if the governor approved the sale, he retained the authority to rescind the sale, which he eventually did.

## DISCUSSION

¶ 10. Hartland and the Association argue on appeal that the circuit court erred in concluding that the

---

[4] Frank Busalacchi in his capacity of secretary of DOT is also a defendant and joined Hartland in its motion for summary judgment and also joined in opposing the Conservancy's motion for summary judgment. However, he has not appealed.

Conservancy had standing to bring this action because there was no direct injury to a legally protectible interest of the Conservancy.[5] The Conservancy responds that it did suffer an injury by virtue of the expenditure of time and effort in negotiating the agreement with Chenequa and in helping Chenequa prepare the offer to purchase. Because of its contract with Chenequa, the Conservancy asserts, it "stands in the shoes" of Chenequa as a bidder for the property and therefore has a legally protectible interest in DOT following the requirements of Wis. Stat. § 84.09(5) and its manual on the sale of the property.[6]

¶ 11. In order to maintain an action for declaratory judgment, there must be a justiciable controversy, which exists when these requirements are met:

> (1) A controversy in which a claim of right is asserted against one who has an interest in contesting it.

---

[5] They also argue that the circuit court made errors of law in granting summary judgment against them and, in the alternative, that there are disputed issues of fact requiring a trial. It is unnecessary to address these arguments because the issue of standing is dispositive.

[6] The Conservancy also asserts that it "had a substantial interest in acquiring and preserving the State property" but it does not argue that it has a legally protectible interest in acquiring and preserving the property; it argues only that it has a legally protectible interest in DOT following the requirements of the statute and the manual. The Conservancy emphasizes that it is not seeking a declaratory judgment that it is the rightful owner of the property. We therefore understand the Conservancy's reference to its "substantial interest in acquiring and preserving the property" to be an explanation of its motive for contracting with Chenequa and not a separate legally protectible interest that requires analysis.

(2) The controversy must be between persons whose interests are adverse.

(3) The party seeking declaratory relief must have a legal interest in the controversy—that is to say, a legally protectible interest.

(4) The issue involved in the controversy must be ripe for judicial determination.

*Loy v. Bunderson*, 107 Wis. 2d 400, 410, 320 N.W.2d 175 (1982).

■

¶ 12. The third requirement is often expressed in terms of standing. *City of Madison v. Town of Fitchburg*, 112 Wis. 2d 224, 228, 332 N.W.2d 782 (1983). Whether a party has standing presents a question of law, which we review de novo. *Lake Country Racquet & Athletic Club, Inc. v. Vill. of Hartland*, 2002 WI App 301, ¶ 13, 259 Wis. 2d 107, 655 N.W.2d 189.

¶ 13. The formulation for analyzing the issue of standing has varied somewhat in the case law, in part depending on the nature of the claim asserted. The parties each use a somewhat different formulation in their arguments. We therefore begin by discussing what standard we should apply.

¶ 14. In *State ex rel. First National Bank v. M&I Peoples Bank*, 95 Wis. 2d 303, 308–09, 290 N.W.2d 321 (1980), where injunctive and declaratory relief was sought on the ground that a statute was unconstitutional, the court followed the approach of federal law on standing and concluded the plaintiff must have suffered some actual or threatened injury from the allegedly illegal action and there must be a logical nexus between the status of the plaintiff and the claim sought to be

adjudicated.[7] The court there did not specifically discuss standing for a declaratory judgment. However, in *Madison Gen. Hosp. Ass'n v. City of Madison*, 71 Wis. 2d 259, 265, 237 N.W.2d 750 (1976), the court did analyze standing for declaratory judgment actions in particular and applied the "logical nexus" requirement to determine whether there was a legally protectible interest. The court there held the plaintiff hospital was the "direct object" of the tax exemption granted in the statute and therefore had standing, or a legally protectible interest, to determine the extent of the exemption. *Id.*

¶ 15. A somewhat different formulation has been used when determining whether a person has standing to appeal an administrative agency decision under WIS. STAT. ch. 227, again tracking federal law on challenges to agency actions: the challenged action must cause the plaintiff or petitioner injury in fact and the interest injured must be one protected by law, that is, arguably within the zone of interests to be protected or regulated by the statute or constitutional provision in question. *Wisconsin's Envtl. Decade, Inc. v. PSC*, 69 Wis. 2d 1, 10, 230 N.W.2d 243 (1975), citing *Ass'n of Data Proc. Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152–53 (1970). This

---

[7] The court in *State ex rel. First National Bank v. M&I Peoples Bank*, 95 Wis. 2d 303, 308–09, 290 N.W.2d 321 (1980), primarily used the analysis of *Flast v. Cohen*, 392 U.S. 83, 102 (1968), and *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The court recognized that the requirement of an actual or threatened injury for standing under federal law derived from the Article III "cases and controversies" limitation on federal court jurisdiction, U.S. CONST. art. III, § 2, cl. 1, which did not apply to Wisconsin courts. *First Nat'l Bank*, 95 Wis. 2d at 308 n.5. However, the court viewed the doctrine of standing to be a matter of sound judicial policy. *Id.*

court has applied this standard in a challenge to an administrative agency action that was not brought under ch. 227. *State ex rel. Parker v. Fiedler*, 180 Wis. 2d 438, 447–48, 509 N.W.2d 440 (Ct. App. 1993), *rev'd on other grounds*, 184 Wis. 668, 517 N.W.2d 449 (1994).

■

¶ 16. We view the "logical nexus" requirement and the "arguably within the zone of interests sought to be protected" requirement as essentially equivalent: both require that the actual or threatened injury be to an interest that is arguably protected by the statutory or constitutional law upon which the plaintiff bases the claim for relief. Because this suit challenges the actions of DOT taken pursuant to Wis. Stat. § 84.09(5), we will use the "zone of interests" terminology. Thus, in order to have standing in this action, the Conservancy must have suffered or be threatened with an injury to an interest that is legally protectible, meaning that the interest is arguably within the zone of interests that § 84.09(5) seeks to protect.[8]

---

[8] Although cases of this court addressing standing in declaratory judgment actions have not used this precise formulation, our analyses have been consistent with it. Generally, in prior cases we have either concluded there was no injury, and thus there was no need to analyze whether there was a "legally protectible" interest that was injured or threatened with injury, *see, e.g., Lake Country Racquet & Athletic Club, Inc. v. Vill. of Hartland*, 2002 WI App 301, ¶ 23, 259 Wis. 2d 107, 655 N.W.2d 189, or, without specifically discussing the meaning of "legally protectible," we have analyzed the relevant constitutional provision or statute. *See, e.g., Vill. of Slinger v. City of Hartford*, 2002 WI App 187, ¶¶ 13–17, 256 Wis. 2d 859, 650 N.W.2d 81 (annexation statute indicated legislative intent not to permit persons owning property outside annexed territory to challenge annexation); *Town of Eagle v. Christensen*, 191 Wis. 2d 301, 312–17, 529 N.W.2d 245 (Ct. App. 1995) (discussing the alleged

¶ 17. The injury asserted must be such that it gives the plaintiff a personal stake in the outcome of the controversy. *First Nat'l Bank*, 95 Wis. 2d at 308–09. The injury need not be pecuniary; it may, for example, be an injury to interests that are aesthetic, conservational, or recreational. *See Wisconsin's Envtl. Decade*, 69 Wis. 2d at 10. The injury need not be of great magnitude, *First Nat'l Bank*, 95 Wis. 2d at 309; and it need not have already occurred, but instead may be one that will allegedly result from a sequence of events set in motion by the agency's conduct. *Wisconsin's Envtl. Decade*, 69 Wis. 2d at 14.

¶ 18. When a challenge is made to standing as alleged in a complaint, we take the allegations in the complaint as true and liberally construe them in the plaintiff's favor. *See Thompson v. Kenosha County*, 64 Wis. 2d 673, 679, 221 N.W.2d 845 (1974). The amended complaint here alleges that the Conservancy is a non-profit conservation organization; it entered into the contract with Chenequa, attached as an exhibit, for the purpose of ensuring that the property, which includes substantial wetlands and high-quality agriculture, is retained as undeveloped open space in accordance with Chenequa's open space plan; it deposited $100,000 in the escrow account pursuant to the agreement; and "as the third party beneficiary of Chenequa's competing offer to purchase the State Property, the Conservancy has a cognizable interest in WisDOT's compliance with

inequities in taxation resulting from the challenged conduct in light of the protection afforded by the uniformity clause); *Weber v. Town of Lincoln*, 159 Wis. 2d 144, 149, 463 N.W.2d 869 (Ct. App. 1990) (referring to statute authorizing affected owners of real estate within a town to enforce a zoning ordinance).

statutes and established written policies governing the openness and integrity of the agency's sales of surplus land."[9] In spite of the lack of express allegations on the Conservancy's and Chenequa's future intentions, we conclude that a liberal construction in the Conservancy's favor permits the inference that, if the property is reconveyed to the state and again put up for sale, Chenequa will make another offer to purchase based on the same arrangement with the Conservancy. We agree with the Conservancy that, because of its contract with Chenequa, it need not have made the offer itself to have an interest that was injured by DOT's sale of the property to Hartland.

¶ 19. However, Hartland and the Association point to the minutes of the January 7, 2003 meeting as evidence that Chenequa does not intend to renew its offer to purchase if the sale to Hartland is voided. They argue, in effect, that the Conservancy does not have a stake in the outcome of this litigation unless Chenequa intends to renew its offer to purchase and its contract with the Conservancy if the Conservancy is successful

---

[9] Hartland and the Association argue that the Conservancy is not a third-party beneficiary because there was no contract between DOT and Chenequa. However, it is clear from the Conservancy's briefs in the circuit court and before this court that by using the phrase "third party beneficiary of Chenequa's competing offer to purchase," the Conservancy is not invoking the third-party beneficiary doctrine, which allows a third party to sue for breach of contract between two other parties when certain conditions are met. *See Goossen v. Estate of Standaert,* 189 Wis. 2d 237, 249, 525 N.W.2d 314 (Ct. App. 1994). Rather, the Conservancy simply means to convey that its contract with Chenequa gave it an interest in how DOT responded to Chenequa's offer.

in this litigation.[10] We find it unnecessary to resolve this issue. We will assume without deciding that either the Conservancy does intend to make its own offer to purchase the property if it succeeds in voiding the sale and a public sale thereafter takes place, or Chenequa intends to renew its offer to purchase and renew its contract with the Conservancy. With this assumption, we proceed to address the second requirement—that the interest injured or threatened with injury is legally protectible.

██

¶ 20. The Conservancy argues that its interest in DOT following the requirements of Wis. Stat. § 84.09(5) and DOT's manual is legally protectible because— standing in the shoes of Chenequa, which offered to purchase the property—it is the beneficiary of the statute and DOT's manual provisions. The Association and Hartland contend that the Conservancy has no legally protectible interest because nothing in the statute or DOT manual indicates an intent to benefit an entity in the Conservancy's position.

---

[10] The Conservancy does not respond to the argument concerning the minutes; in fact, it does not mention the minutes in its brief. In its decision on standing, the circuit court noted in a footnote that whether Chenequa still wanted to be involved was irrelevant, because, if the Conservancy prevailed on its argument that DOT had violated its manual in having a private sale and if a public sale occurred in the future, the sale would not need to be to a municipality. Apparently the circuit court concluded that the amended complaint, liberally construed, indicated that the Conservancy would make its own offer to purchase in that situation. However, the Conservancy does not make this argument on appeal.

¶ 21. WISCONSIN STAT. § 84.09(5) authorizes DOT to sell at private or public sale any property owned by the state, subject to certain exceptions not applicable here, if: (1) DOT "determines that the property is no longer necessary for the state's use for highway purposes" or is not the subject of a petition by the department of administration under WIS. STAT. § 16.375(2), and (2) the governor approves. Other than the determination under the first point, there are no substantive criteria for determining what property to sell. There are also no substantive criteria for determining whether to sell at a public or private sale or for determining to whom to make the sale. The only procedures established in the statute for the sale (beyond the requirement that the funds be deposited in the transportation fund and be used to pay the expenses incurred by DOT in connection with the sale) relate to the process between DOT and the governor: DOT must "present to the governor a full and complete report of the property to be sold, the reason for the sale, and the minimum price for which the same should be sold together with an application for the governor's approval of the sale," and the governor "shall thereupon make such investigation as he or she may deem necessary and approve or disapprove the application." Section 84.09(5).

¶ 22. There is nothing in WIS. STAT. § 84.09(5) that indicates this section was intended to establish procedures to protect persons or entities interested in purchasing state property. The "full and complete report" is plainly for the governor's benefit, not the benefit of potential purchasers. If the report is inadequate, the governor may ask for additional information or make his or her own investigation; but we see no indication that the intent is to protect potential purchasers from the governor having inadequate information on which to

base a decision to approve or disapprove. Similarly, the requirement of the governor's approval is a limitation on the authority of DOT for the benefit of the governor, not the benefit of potential purchasers. If the governor's signature showing approval is affixed to a recommendation in error, as the amended complaint alleges, the governor may have some recourse, but we see no indication of an intent to protect potential alternative purchasers from such a mistake.

¶ 23. The Conservancy argues that WIS. STAT. § 84.09(5) is intended to protect a duty of DOT to the public. Relying on *Aqua-Tech, Inc. v. Como Lake Protection & Rehabilitation District*, 71 Wis. 2d 541, 239 N.W.2d 25 (1976), the Conservancy asserts that, because it stands in Chenequa's shoes, it has a legally protectible interest in DOT fulfilling its duty to the public.

¶ 24. The statute at issue in *Aqua-Tech*, WIS. STAT. § 33.22(1), authorizes public inland lake protection and rehabilitation districts to enter into contracts, and requires that contracts for services or materials over a certain amount "shall be let by the commissioners to the lowest responsible bidder in such manner as they prescribe." Aqua-Tech sued a district alleging that it was the low bidder and seeking a permanent injunction ordering the district to award it the bid. *Id.* at 544–45. The court stated that statutory bidding requirements such as this were intended to benefit the public by, among other purposes, making sure the public received the best work or supplies at the most reasonable price. *Id.* at 550. Therefore, a taxpayer had standing to challenge the grant of a contract to one other than the low responsible bidder. *Id.* at 553. There was no allegation that Aqua-Tech was a taxpayer, *id.*, and, the court stated, an individual bidder "has no fixed, absolute right

to the contract." *Id.* at 552. However, the court referred to "the general rule . . . that a private citizen or individual may sue in his own name and for his own benefit to challenge the violation of a public duty when it appears he has suffered an injury peculiar to himself which is not sustained by the public in general." *Id.* at 553. The court observed that the complaint alleged a violation of the public duty under § 33.22(1) to let the contract to the lowest bidder, that "Aqua-Tech, as acknowledged low bidder, will suffer the loss of a business opportunity if the contract is awarded to another party," and that "a bidder on a public contract is in a particularly good position to challenge the bidding authority's action and thereby protect the rights of the public." *Id.*

¶ 25. Unlike Wis. Stat. § 33.22(1), Wis. Stat. § 84.09(5) contains no requirement that the sale be to the party offering the best price, and, in fact, does not even refer to a bidding process. As we have stated above, there are no procedures imposed on DOT other than submitting the prescribed report to the governor and obtaining the governor's approval, and there are no substantive requirements governing the sale imposed on either DOT or the governor, other than DOT's obligation to determine that the property is no longer necessary for highway purposes and not subject to a petition under Wis. Stat. § 16.375(2). Section 84.09(5) is therefore not analogous to the statute at issue in *Aqua-Tech*. There is nothing in § 84.09(5) that suggests it is intended to ensure the public gets the highest price for the property, or that the sales be carried out in particular ways to benefit the public.

¶ 26. We conclude that neither the Conservancy's interest as a potential purchaser of property for sale under Wis. Stat. § 84.09(5) nor the general public's

interest in such sales are arguably within the zone of interests the statute is intended to protect.

¶ 27. The Conservancy also asserts that it is the beneficiary of DOT policies in the Real Estate Program Manual and, therefore, it has a legally protectible interest in DOT following those policies. The specific provisions on which the Conservancy relies state, in summary, that the primary method for selling surplus land is through a public bid process, which is spelled out, and private sales are to be "rare exceptions," as are sales to municipalities for other than public uses; both are to conform to "strict criteria," which are spelled out. BUREAU OF HIGHWAY REAL ESTATE, DEP'T OF TRANSP., REAL ESTATE PROGRAM MANUAL §§ 6.4.1.6, 6.4.4–6.4.5 (2000). The Association contends that the manual is intended to serve as a resource tool for the DOT real estate staff, not to provide a benefit for or protect the interests of either persons in the Conservancy's position or citizens in general, except to the extent its provisions are already requirements under state or federal law or administrative rules. The Association relies on the "Welcome" and the "Disclaimer" at the beginning of the manual, which make these statements.[11]

---

[11] The Real Estate Program Manual provides in part:

**Welcome** to the Bureau of Highway Real Estate Program Manual. This Manual serves as a resource tool for Wisconsin Department of Transportation Real Estate Staff, providing statewide policy and guidelines. We have also made the Manual accessible as a convenience to our our [sic] business partners. More information can be found in the disclaimer below. Questions and comments should be directed to *Eric Boucher* at the Bureau of Highway Real Estate, Wisconsin Department of Transportation.

**Disclaimer:** This manual is provided as a public service by the Bureau of Highway Real Estate (BHRE) Wisconsin Department of

¶ 28. We are not persuaded by the Conservancy's argument that it has a legally protectible interest based on the manual. First, the Conservancy does not provide any authority for its premise that the manual provisions may be the source of legal protection of the interest it asserts in the same way that a statute or constitutional provision may be. Second, because we have already decided that neither the Conservancy's interest as a potential purchaser nor the interest of the general public are within the zone of interests WIS. STAT. § 84.09(5) is intended to protect, we do not see how a manual prepared by DOT for use in sales under that statute can alter that result.

¶ 29. Third, the manual has not been formally adopted as a rule under WIS. STAT. ch. 227, and the

Transportation (WisDOT). The contents of the Highway Real Estate Manual reflect the policies, guidelines, and practices of the WisDOT Real Estate Program. It is impractical, if not impossible, to compile a manual of this type which addresses or anticipates all possible situations. The information contained within this manual is offered for use in understanding the policies of the WisDOT Real Estate Program and is not meant to be the basis for creating absolute requirements or law except where state or federal law or administrative rules with the force of law apply. The Bureau of Highway Real Estate Management, on behalf of WisDOT, has the ability to exercise discretionary judgment in the use or application of this manual.

The policies in the Manual are updated frequently but not instantly. The manual may reflect policies recently changed, and thus no longer accurate. BHRE is not responsible to provide notice to users as to when any modifications are made.

The existence, distribution, application, and use of this manual do not constitute an acknowledgment or guarantee of outcome, expressed or implied, by WisDOT.

BUREAU OF HIGHWAY REAL ESTATE, DEP'T OF TRANSP., REAL ESTATE PROGRAM MANUAL (2000).

Conservancy refers us to no statute that either authorizes or requires DOT to promulgate rules to implement WIS. STAT. § 84.09(5). The Conservancy may be of the view that the manual is a "rule" within the meaning of WIS. STAT. § 227.01(13)[12] even though it has not been formally promulgated as one. However, "materials developed by an agency as a reference aid for its staff that are 'couched . . . in terms of advice and guidelines rather than setting forth law-like pronouncements' are not a 'rule' within the meaning of . . . § 227.01(13) because they are not intended to have the effect of law." *County of Dane v. Winsand*, 2004 WI App 86, ¶ 11, 271 Wis. 2d 786, 679 N.W.2d 885 (citation omitted). We conclude that the manual is intended to provide advice and guidelines to the DOT staff and is not intended to have the effect of law.

¶ 30. In summary, we conclude the Conservancy does not have a legally protectible interest in the requirement in WIS. STAT. § 84.09(5) that DOT provide a complete report to the governor or in the requirement of the governor's approval; nor does the Conservancy have a legally protectible interest in DOT's compliance with its manual. Accordingly, even if we assume the Conservancy would make an offer to purchase either on its own or in conjunction with Chenequa if the sale to

---

[12] WISCONSIN STAT. § 227.01(13) provides:

> (13) "Rule" means a regulation, standard, statement of policy or general order of general application which has the effect of law and which is issued by an agency to implement, interpret or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency. "Rule" does not include, and s. 227.10 does not apply to, any action or inaction of an agency, whether it would otherwise meet the definition under this subsection, which: . . . . [Exceptions (a) thru (zu).]

Hartland were voided, it does not have standing to challenge that sale on the grounds alleged in the amended complaint. We therefore reverse the judgment of the circuit court and remand with directions to enter an order dismissing the amended complaint.

*By the Court.*—Judgment reversed and cause remanded with directions.