Peggy Z. Coyne, Mary Bell, Mark W. Taylor, Corey Otis, Marie K. Stangel, Jane Weidner and Kristin A. Voss, Plaintiffs-Respondents,

v.

Scott Walker and Michael Huebsch, Defendants-Appellants,†

Anthony Evers, Defendant-Respondent.

Court of Appeals

*No. 2013AP416. Submitted on briefs October 7, 2013. —Decided February 19, 2015.*

2015 WI App 21

(Also reported in 862 N.W.2d 606.)

† Petition for Review Filed.

225

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Maria S. Lazar*, assis-

tant attorney general, *Kevin M. St. John*, deputy attorney general, and *J.B. Van Hollen*, attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Ryan Nilsestuen* and *Janet A. Jenkins* for Wisconsin Department of Public Instruction of Madison.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Lester A. Pines*, *Susan M. Crawford* and *Tamara B. Packard* of *Cullen Weston Pines & Bach LLP*, Madison, and *Stephen Pieroni* of Wisconsin Education Association Council of Madison.

A nonparty brief was filed by *Richard M. Esenberg*, *Charles J. Szafir*, *Michael Fischer*, *Thomas C. Kamenick* and *Brian W. McGrath* for Wisconsin Institute for Law & Liberty of Milwaukee.

Before Blanchard, P.J., Lundsten and Sherman, JJ.

¶ 1. SHERMAN, J.   Scott Walker and Michael Huebsch, Governor and Secretary of Administration, respectively, of the State of Wisconsin, appeal from a summary judgment order holding that provisions in 2011 Wis. Act 21 involving the process of drafting and promulgating administrative rules are unconstitutional and, therefore, void as applied to Wisconsin's State Superintendent of Public Instruction (SPI), and permanently enjoining Walker and Huebsch from implementing the provisions with respect to the SPI. For the reasons discussed below, we affirm the circuit court.

## BACKGROUND

¶ 2.   In 2011, the Wisconsin legislature enacted, and Walker signed into law, Act 21, which made

several changes to administrative rulemaking.[1] Pertinent here, Act 21 adds a procedural requirement that all state agencies, as well as the SPI, submit proposed scope statements *to the Governor* for approval. *See* Wis. Stat. § 227.135 (2013–14).[2] Under Act 21, rulemaking cannot proceed further until the Governor approves the scope statement. *See* § 227.135(2). Additionally, Act 21 directs that if the Governor approves the scope statement and a rule is drafted, the Governor must also approve the draft version of the rule before the proposed rule may be submitted to the legislature for review. *See* Wis. Stat. §§ 227.185 and 227.19. If the proposed rule could lead to a level of costs for busi-

---

[1] The facts are not disputed.

[2] Wisconsin Stat. § 227.135 provides:

**Statements of scope of proposed rules.** (1) An agency shall prepare a statement of the scope of any rule that it plans to promulgate. The statement shall include all of the following:

(a) A description of the objective of the rule.

(b) A description of existing policies relevant to the rule and of new policies proposed to be included in the rule and an analysis of policy alternatives.

(c) The statutory authority for the rule.

(d) Estimates of the amount of time that state employees will spend to develop the rule and of other resources necessary to develop the rule.

(e) A description of all of the entities that may be affected by the rule.

(f) A summary and preliminary comparison of any existing or proposed federal regulation that is intended to address the activities to be regulated by the rule.

All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted. References to the relevant statutes prior to the enactment of 2011 Wis. Act 21, where they differ from the 2013–14 version, will be referenced to the 2009–10 version and noted accordingly.

nesses, municipalities, or individuals specified in the law, the Secretary of Administration must also review and approve the proposed rule before it can proceed to the legislature.

¶ 3.  Shortly after Act 21 was enacted, Peggy Z. Coyne, Mary Bell, Mark W. Taylor, Corey Otis, Marie K. Stangel, Jane Weidner, and Kristin A. Voss (the Coyne parties) filed an action for declaratory judgment, asking the circuit court to declare Act 21 unconstitutional as it applies to the SPI. Walker and Huebsch challenged the Coyne parties' standing in a motion to dismiss, which the circuit court denied. Thereafter, both parties moved the circuit court for summary judgment. The circuit court granted summary judgment in favor of the Coyne parties, concluding that parts of Act 21 are unconstitutional as applied to the SPI. Walker and Huebsch appeal.

## DISCUSSION

¶ 4.  On appeal, Walker and Huebsch renew their argument that the Coyne parties lack standing. Also, Walker and Huebsch make several arguments supporting their view that Act 21, as applied to the SPI, is constitutional. In the latter respect, they first argue that administrative rulemaking is not a supervisory power of the SPI within the meaning of article X, section 1 of the Wisconsin Constitution, but is instead a legislative power that may be delegated by the legislature with qualifications. *See* WIS. CONST. art. X, § 1. Second, Walker and Huebsch argue that even if rulemaking relating to education is a supervisory power of the SPI, Act 21 is constitutional because it does not give such powers to any other officers. Third, Walker and Huebsch argue that, even if rulemaking is a supervisory power and even if Act 21 gives such

231

power to other officers, Act 21 is still constitutional because the role of the SPI is still the superior role.[3]

## A. Standing

¶ 5.  Before we reach the constitutionality of Act 21, we first address the preliminary question of whether the Coyne parties have standing to bring the present action. In the circuit court, Walker and Huebsch challenged the standing of the Coyne parties in a motion to dismiss prior to filing a responsive pleading. *See* Wis. Stat. § 802.06(2). The circuit court denied the motion. Walker and Huebsch then answered the complaint and asserted affirmative defenses. The answer and affirmative defenses did not reassert the challenge to the standing of the Coyne parties. In their later motion for summary judgment, Walker and Huebsch did not raise the issue of standing, and the circuit court did not address standing in its decision and order on motions for summary judgment. Therefore, we address the issue of standing in the context of a challenge to the complaint. *See Town of Eagle v. Christensen*, 191 Wis. 2d 301, 315, 529 N.W.2d 245 (Ct. App. 1995).

¶ 6.  Whether a party has standing to seek declaratory relief presents a question of law, which we review *de novo. Chenequa Land Conservancy, Inc. v. Village of Hartland*, 2004 WI App 144, ¶¶ 11–12, 275 Wis. 2d 533, 685 N.W.2d 573. When a standing argument comes before us upon a motion to dismiss, we take all claims in the complaint as true. *McConkey v.*

---

[3] Walker and Huebsch state that if Act 21 is unconstitutional under *Thompson v. Craney,* 199 Wis. 2d 674, 699, 546 N.W.2d 123 (1996), they may ask the Wisconsin Supreme Court to consider re-examining *Thompson.*

*Van Hollen*, 2010 WI 57, ¶ 14 n.5, 326 Wis. 2d 1, 783 N.W.2d 855. We construe the complaint in favor of the complaining party. *Town of Eagle*, 191 Wis. 2d at 316. We do not construe standing narrowly or restrictively. *Id.*

■■

¶ 7. "Unlike the federal courts, which can only hear 'cases' and 'controversies,' standing in Wisconsin is not a matter of jurisdiction." *McConkey*, 326 Wis. 2d 1, ¶ 15. Rather, it is sound judicial policy, the purpose of which is to ensure that the issues and arguments presented will be carefully developed, zealously argued, and allow the court to understand the consequences of its decision. *Id.*, ¶¶ 15–16. In *Wisconsin's Envtl. Decade, Inc., v. PSC*, 69 Wis. 2d 1, 10, 230 N.W.2d 243 (1975), the supreme court set forth a two-step analysis for a challenge to standing: "(1) Does the challenged action cause the petitioner injury in fact? and (2) is the interest allegedly injured arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question?"

¶ 8. The Coyne parties stated their claim for standing in their complaint on three different grounds: as taxpayers,[4] as public school teachers, and as parents. Walker and Huebsch challenged the

---

[4] The complaint alleges that all of the Coyne parties are taxpayers. With respect to their standing as taxpayers, the complaint alleges:

25. The enactment of Act 21 will result in the Defendants' disbursement of tax revenues to meet the increased costs of the Department of Public Instruction, the Department of Administration, and the Governor's office to implement the unconstitutional procedures for the promulgation of administrative rules relating to public education by the DPI.

233

Coyne parties' standing on each of the three grounds. Applying the two-part test and case law specific to taxpayer standing, we agree with the Coyne parties that they have standing as taxpayers, and therefore do not address whether they also have standing as teachers and parents.

¶ 9. The supreme court has held that a taxpayer has standing to challenge the constitutionality of a statute when " 'any illegal expenditure of public funds directly affects taxpayers and causes them to sustain a pecuniary loss. The fact that the ultimate pecuniary loss to the individual taxpayer may be almost infinitesimal is not controlling.' " *City of Appleton v. Town of Menasha*, 142 Wis. 2d 870, 879–80, 419 N.W.2d 249 (1988) (quoted source omitted). This statement of law in *City of Appleton* is consistent with the two-part test for standing because the expenditure of public funds is treated as a pecuniary loss.

¶ 10. Walker argues that "Act 21 does not require the expenditure of public funds." Whatever the merits of this factual assertion, it is part of an argument that Walker forfeited after moving to dismiss by failing to litigate whether the standing-related allegations in the complaint were true.

■

¶ 11. As we have explained, Walker moved to dismiss based on the pleadings, but did not subsequently seek to litigate whether the standing-related allegations in the complaint were true. Accordingly, under the law we have described, we must accept as true the allegation in the complaint that Act 21 will result in the expenditure of funds and construe the complaint in favor of the Coyne parties. What remains is the question of whether this alleged fact, if true,

along with the allegation that Act 21 is unconstitutional, is sufficient to confer standing on the Coyne parties.

¶ 12. Walker and Huebsch sum up the law on taxpayer standing by stating: "These cases stand at most for the principle that taxpayer standing may exist if the portion of the statute claimed to be unconstitutional by its terms or implementation directly requires the expenditure of tax funds." Walker and Huebsch then assert that this legal standard is not met because "the challenged portions of Act 21 do not implicate any taxpayer funding." But Walker and Huebsch do not explain why the *allegations in the complaint,* if true, do not meet this standard.[5] In the complaint the Coyne parties assert that Act 21 will result in the disbursement of tax revenues to "implement the unconstitutional procedures for the promulgation of administrative rules" and to "meet the increased costs of the Department of Public Instruction." Walker and Huebsch may disagree with the accuracy of these allegations, but for purposes of a challenge to standing, their opportunity to litigate the accuracy of these claims has passed.

¶ 13. In sum, because the Coyne parties have alleged in their complaint that Act 21 will cause the illegal expenditure of public funds affecting them as taxpayers and causing them to sustain a pecuniary

---

[5] In his reply brief, Walker asserts: "There must be more than just an allegation that there will be an illegal expenditure of funds." Walker does not, however, further explain this legal assertion or supply authority for it. *See State v. Pettit,* 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we do not consider arguments unsupported by legal authority or otherwise undeveloped).

loss, we conclude that the Coyne parties have sufficiently alleged standing as taxpayers. Because they have standing as taxpayers, it is unnecessary for us to address whether or not the Coyne parties also have standing as teachers and/or parents. *See Turner v. Taylor*, 2003 WI App 256, ¶ 1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (when a decision on one issue is dispositive, we need not reach other issues raised).

## B. *Constitutionality of Act 21*

■

¶ 14. Having determined that the Coyne parties have standing to challenge the constitutionality of Act 21, we address the main issue before us, which is whether Act 21 is unconstitutional as applied to the SPI. There are no facts in dispute and, thus, we are presented solely with a question of constitutional law that we decide de novo. *See Martinez v. DILHR*, 165 Wis. 2d 687, 695, 478 N.W.2d 582 (1992).

■

¶ 15. Litigants asserting a constitutional challenge face a high standard. *Bostco LLC v. Milwaukee Metro. Sewerage Dist.*, 2013 WI 78, ¶ 76, 350 Wis. 2d 554, 835 N.W.2d 160. Legislative enactments are presumed constitutional, and any reasonable doubt is resolved in favor of upholding the statute's constitutionality. *Id.* To meet his or her burden when challenging the constitutionality of a statute, the party raising the constitutional challenge must prove that the statute is unconstitutional beyond a reasonable doubt. *Martinez*, 165 Wis. 2d at 695. " '[P]art of a statute may be unconstitutional, and the remainder may still have effect, provided the two parts are distinct and separable and are not dependent upon each other.' " *State v.*

*Hezzie R.*, 219 Wis. 2d 848, ¶ 13, 580 N.W.2d 660 (1998) (quoted source omitted).

## C. *Rule Promulgation Process and Act 21*

¶ 16.  We first briefly summarize, for background, the rule promulgation process and how Act 21 significantly changes that part of the process relevant to the issues before us.[6] This appeal concerns those provisions which grant to the Governor (and in some cases the Secretary of Administration) the power to block approval of proposed rules promulgated by the SPI.

¶ 17.  The rulemaking process begins with drafting and publishing a "scope" statement, which is a statement that explains what the proposed rule will cover, along with other information required by statute. Wis. Stat. § 227.135. Once the scope statement is published, the agency proceeds to prepare a draft rule. *See* Wis. Stat. § 227.14. Before Act 21, the promulgating agency may not begin drafting a rule until the agency has received approval of the scope statement by the head of the agency proposing to promulgate the rule, and until the approved scope statement is published. *See* § 227.135 (2009–10). After Act 21, an additional approval is required at this stage; the Governor must also approve a scope statement. *See* § 227.135(2). Whether or not to approve a scope statement is a matter for the Governor's discretion. *See id.*

¶ 18.  Both before and after Act 21, an agency prepares a draft of a proposed rule and, thereafter, the rule is submitted to the joint legislative council, where the council staff reviews the proposed rule to ensure that the proposed rule complies with both procedural

---

[6] *See* Ronald Sklansky, *Changing the Rules on Rulemaking,* Wisconsin Lawyer, Vol. 84, No. 8 (Aug. 2011).

and substantive requirements. Wis. Stat. § 227.15. The promulgating agency must then provide notice of and a public hearing on the proposed rule. Public comment may cause the agency to prepare successive drafts, which require additional notice and public hearings. Wis. Stat. §§ 227.16–18. When the proposed rule is in final form, it is subject to further review, including the preparation of an economic impact analysis.[7] *See* Wis. Stat. § 227.137.

¶ 19.  Prior to Act 21, once the proposed rule was in final form and accompanied by an economic impact statement, the rule was submitted directly to the chief clerk of each house of the legislature for review. *See* Wis. Stat. § 227.19 (2009–10). After Act 21, the proposed rule must be submitted to and approved by the Governor in writing before it may be submitted to the legislature for review. *See* Wis. Stat. § 227.185. The Governor has the discretion to either approve the proposed rule, or not. *Id.* If the Governor does not approve in writing, the process comes to a halt.

¶ 20.  Because the Coyne parties have the burden of demonstrating unconstitutionality beyond a reasonable doubt, we would normally begin our analysis with a discussion as to whether they met that burden. However, here we perceive no dispute that, if we reject the Walker and Huebsch arguments we address below, Act 21 unconstitutionally interferes with the SPI's supervisory power under article X, section 1, by assign-

---

[7] Prior to Act 21, the economic impact analysis was referred to as an economic impact report. Although not relevant to the issue before us, we note that Act 21 made changes to how the economic impact analysis is to be prepared. To clarify, the constitutional challenge that we conclude is successful relates solely to the changed rulemaking procedures we describe, and not other features of Act 21.

ing supervisory power to the Governor that is not subservient to the SPI. Therefore, we proceed on the basis that, if we reject those arguments, Walker and Huebsch effectively concede that the Coyne parties have met their burden.

*D. Whether Rulemaking is a Supervisory Power*

¶ 21. First, Walker and Huebsch argue that "administrative rule[]making is an exercise of legislative power that may be delegated with qualifications by the legislature, not a supervisory power belonging to the Superintendent." We conclude, however, that whether rulemaking is a supervisory power has been resolved in favor of the SPI in *Thompson v. Craney*, 199 Wis. 2d 674, 546 N.W.2d 123 (1996).

¶ 22. In *Thompson*, the Wisconsin Supreme Court held that certain provisions of 1995 Wis. Act 27 unconstitutionally violated article X, section 1 of the Wisconsin Constitution.[8] *Thompson*, 199 Wis. 2d at 678. Act 27 created a State Education Commission, a State Department of Education, and the position of State Secretary of Education. *Id.* at 677–78. The elected SPI became a member of and chair of the new

---

[8] WISCONSIN CONST. art. X, § 1 provides:

**Superintendent of public instruction.** SECTION 1. The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law. The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold office for 4 years from the succeeding first Monday in July. The term of office, time and manner of electing or appointing all other officers of supervision of public instruction shall be fixed by law.

Education Commission, but the new state agency and its secretary were largely under the control of the Governor, rather than the SPI. *Id* . at 678–79. The *Thompson* court concluded that this scheme "unconstitutionally gives the former powers of the elected [S]tate Superintendent of Public Instruction to appointed 'other officers' at the state level who are not subordinate to the superintendent." *Id.* at 678. The *Thompson* court concluded, therefore, that "the education provisions of 1995 Wis. Act 27 [were] void." *Id.*

¶ 23. The *Thompson* decision is complicated, and we do not endeavor to fully summarize it here. Rather, at this juncture, we focus on the portion of *Thompson* that refutes Walker and Huebsch's assertion that rulemaking is not a supervisory power.

¶ 24. In the course of its analysis, the *Thompson* court considered "the first law passed by the legislature [in 1848] setting forth the duties of the SPI." *Id.* at 693. The petitioner in *Thompson*, then Governor Thompson, argued that this 1848 law "shows that the SPI's duties in 1848 were 'exhortatory,' or directed towards encouraging education through, for example, public speaking or visits to schools, but not actual administration." *Id.* at 694. The *Thompson* court rejected this argument, pointing out that the 1848 law stated: "The superintendent shall have a general supervision over public instruction in this state." *Id.* The *Thompson* court went on to explain that many of the duties given to the SPI in the 1848 law were clearly supervisory or administrative: "[t]he SPI was required to apportion school funds between townships, *to propose regulations for making reports and conducting proceedings under the act,* and to adjudicate controversies arising under the school lands." *Id.* at 694–95 (emphasis added). Thus, one of the three listed ex-

240

amples of "clearly [] supervisory" power highlighted by the *Thompson* court was rulemaking. *Id.*

¶ 25.   The *Thompson* decision also refutes what appears to be a closely related argument advanced by Walker and Huebsch. As we understand the argument, Walker and Huebsch take the position that, if the reason the SPI has a "supervisory" power is because the legislature gave it to the SPI, then that power is one the legislature is free to divvy up as the legislature sees fit. If that is what Walker and Huebsch mean to argue, we read *Thompson* as rejecting the argument. The *Thompson* court wrote:   "Under our holding in the present case, the legislature may not give equal or superior [supervision of public instruction] authority to any 'other officer.' " *Id.* at 699. The *Thompson* court also explained:

> [T]he constitutional difficulty with the education provisions of the 1995 Wis. Act 27 is not that it takes power away from the office of the SPI, but rather that it gives the power of supervision of public education to an "other officer" instead of the SPI. As this court has previously stated, the plain language of [a]rticle X, [section] 1, makes the powers of the SPI and the other officers subject to limitation by legislative act . . . .

*Id.* at 698–99. In sum, the legislature has the authority to give, to not give, or to take away SPI supervisory powers, including rulemaking power. What the legislature may not do is give the SPI a supervisory power relating to education and then fail to maintain the SPI's supremacy with respect to that power.

¶ 26.   Before moving on, we note that earlier statements in the *Thompson* decision reinforce our interpretation of the *Thompson* court's discussion of rulemaking as a supervisory power. For example,

241

when the *Thompson* court examined the constitutional debates, the court wrote: "We note two consistent themes from these statements of the delegates: first, that *the* system of education required uniformity; second, that the SPI was to provide this uniformity *in an active manner* by implementing the system of education." *Id.* at 688–89 (emphasis added). The court goes on to say that the SPI, under the constitution, is "an officer with the *ability to put plans into action.*" *Id.* at 689 (emphasis added). In our view, rulemaking is one tool the SPI uses to actively promote uniformity and put educational plans into action.

## E. The Governor's Role

¶ 27. Walker and Huebsch argue that, even if rulemaking is a supervisory power, the role Act 21 gives the Governor in rulemaking does not unconstitutionally impede the SPI's rulemaking supervisory power. According to Walker and Huebsch: "Act 21 does not strip away any of the powers or duties of the Superintendent with respect to the supervision of public instruction. All of the policy-making, supervisory functions remain with the Superintendent both before and after Act 21." If Walker and Huebsch mean to suggest that the power relative to rulemaking given to the Governor under Act 21 is subservient to the power relative to rulemaking retained by the SPI under Act 21, we disagree.

¶ 28. The practical effect of Act 21, with respect to administrative rules proposed by the SPI, is to give the Governor the ability to halt the process of drafting and promulgating administrative rules affecting education at two key stages in the process. The Governor can halt rulemaking earlier on, when a scope statement is prepared, and later just prior to the rule being

submitted to the legislature for approval. *See infra* ¶¶ 17–19. Thus, Act 21 gives the Governor the power to decide that there will be no rule or rule change on a particular subject, irrespective of the judgment of the SPI. Similarly, the Governor may use his approval authority to leverage changes to proposed rules, again irrespective of the SPI's judgment.

¶ 29. In this regard, Walker and Huebsch attempt to persuade us that the scenario here is different than in *Thompson*. They argue that, even if we conclude that rulemaking is an SPI supervisory power within the meaning of article X, section 1, Act 21 nonetheless does not strip away that power. According to Walker and Huebsch, unlike here, the "holding in [*Thompson*] is tied to circumstances where the supervisory powers *with respect to public instruction* are given to other officers." They assert that, unlike the law at issue in *Thompson*, Act 21 does not give others supervisory power. We have trouble understanding this argument. The obvious purpose and effect of the part of Act 21 that we address today is to give the Governor substantial power to shape rulemaking with respect to public instruction. Thus, to the extent we understand Walker and Huebsch's argument differentiating *Thompson* in this regard, we reject it.

¶ 30. Whether or not the powers that are assigned to the Governor reduce the SPI's primacy over supervision of public instruction will be resolved in our discussion of Walker and Huebsch's final argument, which they have characterized as the *Thompson* " 'superiority test.' "

### F. The Superiority Test

¶ 31. We, like Walker and Huebsch, read the main thrust of the supreme court's reasoning in

*Thompson* as recognizing the constitutional directive that the SPI have a superior role in supervising public education.[9] Walker and Huebsch argue, however, that the requirement that the SPI be superior to any other officers in the supervision of public instruction applies to "the sum total of the Superintendent's supervisory powers, not to limitations on its exercise." Walker and Huebsch go on to argue that, as long as the legislature does not transfer "each and every one" of the SPI's supervisory powers to another, article X, section 1 is not violated. In our view, this approach cannot be reconciled with several of the specific holdings of *Thompson*. In particular, the *Thompson* court made clear that it was not ruling on the ability of the legislature to limit the powers and duties of the SPI, but rather on the legislature's power to assign these powers and duties to some other entity not subject to the SPI's authority. *See Thompson*, 199 Wis. 2d at 698–99. We see nothing in *Thompson* that supports the sort of stick-counting approach advocated by Walker and Huebsch. It is true, as Walker and Huebsch suggest, that the law at issue in *Thompson* was a far more sweeping attempt to shift power from the SPI to the Governor. But the court's basic analysis was to assess whether the law gave supervisory power relating to public instruction to others "not subordinate to the [S]uperintendent." *See id.* at 678, 698.

___

[9] Walker and Huebsch write in their brief-in-chief:  "[The] provisions in Act 21 do not make the [SPI] inferior or equal to another officer in the aggregate with respect to the supervision of public instruction. [Rather,] Act 21 'passes' the [*Thompson*] 'superiority' test." Later, Walker and Huebsch write:  "Act 21 does not violate [*Thompson*] because the [SPI] still exercises superior authority with respect to rule[]making."

¶ 32. According to Walker and Huebsch, *Thompson* did not undercut two prior supreme court decisions that "acknowledged that the Legislature may limit the [SPI's] authority or provide that such authority may be shared by others." As we have already discussed, we have no doubt that the legislature may limit the powers and duties of the SPI and, moreover, the legislature's power to do so is not in dispute here. What remains is Walker and Huebsch's assertion that these pre-*Thompson* cases stand for the proposition that the SPI's supervisory authority "may be shared by others." We now address both cases with respect to that assertion.

¶ 33. Walker and Huebsch point to *Fortney v. School Dist. of West Salem,* 108 Wis. 2d 167, 321 N.W.2d 225 (1982). Relevant here, part of that decision addresses whether a collective bargaining agreement, under which arbitration took place, was unconstitutional under article X, section 1, as an infringement on the constitutional hiring and firing power of school boards. *Id.* at 181–82. We acknowledge that *West Salem* provides support for Walker and Huebsch's contention that the legislature has the authority to limit the powers and duties of educational officers under the constitutional provision. However, to the extent *West Salem* addresses the sharing of supervisory power, it does so with respect to "other officers," which the *Thompson* court later ruled was not permitted with respect to the SPI. *West Salem* is simply not germane to the issue before us, which is the assignment of certain powers to the Governor that are not subordinate to those of the SPI in the area of public educational supervision.

¶ 34. Walker and Huebsch also cite *Burton v. State Appeal Bd.,* 38 Wis. 2d 294, 156 N.W.2d 386

(1968), as authority for their proposition that "the Legislature may require the Superintendent to share his authority." However, the supreme court in *Thompson* said otherwise respecting the issue in *Burton*:

> Nothing in *Burton* is contrary to our holding in the present case. While the officers on the appeal board in *Burton* could cast a vote on an appeal board along with the SPI, they were *clearly still subject to the SPI's authority* because they were appointed to the board by the SPI, and served only to review a single dispute.

*Thompson,* 199 Wis. 2d at 699 n.10 (emphasis added).

¶ 35. Walker and Huebsch argue that, under Act 21, "the Superintendent still exercises superior authority with respect to rule[]making." Whether this is intended as a stand-alone argument, or is offered to buttress an argument we have already addressed, we are uncertain. The argument, in its entirety, reads:

> [The Coyne parties'] main argument against Act 21 is that it intrudes upon the Superintendent's supervisory authority by allowing the Governor to reject a scope statement or proposed rule. Act 21, §§ 4, 9; WIS. STAT. §§ 227.185, 227.135, and 227.137(7). But this does not put the Superintendent in an inferior position to the Governor. The Superintendent, through his leadership of DPI, is the *only* officer that can determine the content of a proposed rule or scope statement. It is the Superintendent (or DPI) which drafts the scope statement (WIS. STAT. § 227.135(1)), drafts the economic impact analysis, if any, (WIS. STAT. § 227.137(2)), and drafts the proposed rule (WIS. STAT. § 227.14(1)).
>
> The Governor, on the other hand, has no power to draft a scope statement or an economic impact analysis. The Governor has no power to fashion the text of a proposed rule. It is only the Superintendent who can draft these documents.

> What the Governor may do under Act 21—reject a scope statement or the text of a final rule—is the functional equivalent of a veto. Concluding this limited power makes the Governor "superior" to the Superintendent in the rule[]making context is analogous (and equally misguided) to saying the Governor has superior legislative power to the Legislature because he can veto legislation.
>
> Accordingly, Act 21's inclusion of the Governor in the rule[]making process does not violate the rule in *Thompson v. Craney*.

We reject this argument for reasons that should be obvious by now. The argument's premise, that the Governor's new power conferred by Act 21 gives the Governor "no power to fashion the text of a proposed rule," is a premise Walker and Huebsch do not attempt to explain or defend. So far as we can tell, it is a premise that ignores reality. It seems beyond reasonable dispute that a Governor at loggerheads with an SPI over the content of a proposed rule, or proposed rule change, could use the threat to withhold approval as a means of affecting the rule content. Moreover, the analogy to the Governor's power to veto legislation is unpersuasive. As here, the threat of a Governor's veto *can* shape proposed legislation toward the Governor's preference. And, by constitutional design, a Governor's veto can be overridden by the legislature. Here, the Governor's approval authority is not similarly limited.

¶ 36.  In sum, we affirm the circuit court's conclusion that the Coyne parties have met their burden of demonstration, beyond a reasonable doubt, that particular provisions of Act 21 listed in the circuit court's order that give to the Governor (and in limited cases,

247

the Secretary of Administration) the power to intervene in the process of drafting and promulgating administrative rules are unconstitutional as applied to the SPI. The constitutionality of such provisions as they apply to any officer or agency other than the SPI is not before us and we render no opinion thereupon. The order of the circuit court, by not disturbing Act 21 in any other respect, implies that these provisions are severable. No party has raised severability as an issue and we do not address it here.

## CONCLUSION

¶ 37. For the reasons stated above, we affirm the order of the circuit court.

*By the Court.*—Order affirmed.